**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

LAWRENCE MOTTOLA, Individually          Case No.
and as Executor of the Estate of
ANTHONY MOTTOLA, Deceased;
WILLIAM R. MURPHY, III, Individually
and as Administrator of the Estate of
WILLIAM R. MURPHY, JR., Deceased;
and LISA KRAUSE, as Attorney-in-Fact
of JOHN TROWBRIDGE,

          Plaintiffs,

vs.

PENNSYLVANIA DEPARTMENT OF
MILITARY AND VETERANS
AFFAIRS, as owner and operator of
SOUTHEASTERN VETERANS'
CENTER; ROHAN BLACKWOOD, in
his individual capacity; and DEBORAH
MULLANE, in her individual capacity,

          Defendants.

## PLAINTIFFS' COMPLAINT

AND NOW, come the Plaintiffs, Lawrence Mottola, Individually and as Executor of the

Estate of Anthony Mottola, Deceased; William R. Murphy, III, Individually and as Administrator

of the Estate of William R. Murphy, Jr., Deceased; and Lisa Krause as Attorney-in-Fact of John

Trowbridge, by counsel, Robert F. Daley, Esquire; D. Aaron Rihn, Esquire; and the law firm of

Robert Peirce & Associates, P.C.; and Daniel C. Levin, Esquire; and the law firm of Levin Sedran

Berman, LLP, and claim damages of the Defendants, Pennsylvania Department of Military and

Veterans Affairs, as owner and operator of Southeastern Veterans' Center; Rohan Blackwood, in

his individual capacity; and Deborah Mullane, in her individual capacity, and allege the following

in support:

## JURISDICTION AND VENUE

1.      This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 as certain claims in this action arise under the Constitution and laws of the United States.

2.      This Honorable Court has supplemental jurisdiction over the common law state claims pursuant to 28 U.S.C. § 1367.

3.      Venue is proper in this District under 28 U.S.C. § 1391(b) because all of the events, actions, and omissions giving rise to the within claims occurred in this District.

## PARTIES – DECEASED PLAINTIFFS

### I.     Anthony Mottola

4.      Plaintiff Lawrence Mottola is an adult individual with an address of 236 White Oak Road, Strasburg, Lancaster County, Pennsylvania 17579.

5.      Lawrence Mottola is the son of the deceased, Anthony Mottola.

6.      Anthony Mottola died on May 21, 2020 at the age of 87.

7.      Lawrence Mottola was appointed the Administrator of the Estate of Anthony Mottola by the Register of Wills for the County of Chester on July 21, 2021.

8.      As Administrator of the Estate of Anthony Mottola, Lawrence Mottola brings this action under 42 Pa. Cons. Stat. § 8302 (Survival) on behalf of the Estate of Anthony Mottola.

9.      As the "personal representative" of the Estate of Anthony Mottola, Lawrence Mottola brings this action under 42 Pa Cons. Stat. § 8301 (Wrongful Death) and Pa. R. Civ. P. 2202(a) on his own behalf and on behalf of all wrongful death beneficiaries.

10.     The names and addresses of all persons legally entitled to recover damages for the wrongful death of Anthony Mottola, and their relationships to him, are as follows:

| **Name** | **Address** | **Relationship** |
|---|---|---|
| Lawrence Mottola | 236 White Oak Road<br>Strasburg, PA 17579 | Son |
| Anthony Mottola, Jr. | 366 Delaware Avenue<br>Staten Island, NY 10305 | Son |
| Joseph Mottola | 509 W. Orange Street<br>Litiz, PA 17543 | Son |

11.     At no time during his life did Anthony Mottola bring an action to recover damages for his personal injuries, and no other action has been filed to recover damages for the wrongful death of Anthony Mottola.

## II. William R. Murphy, Jr.

12.     Plaintiff William R. Murphy, III is an adult individual with an address of 9270 Windy Bush Lane, Breinigsville, Lehigh County, Pennsylvania 18031.

13.     William R. Murphy, III is the son of the deceased, William R. Murphy, Jr.

14.     William R. Murphy, Jr. died on April 20, 2020 at the age of 63.

15.     William R. Murphy, III was appointed the Administrator of the Estate of William R. Murphy, Jr. by the Register of Wills for Chester County on June 8, 2020.

16.     As Administrator of the Estate of William R. Murphy, Jr., William R. Murphy, III brings this action under 42 Pa Cons. Stat. § 8302 (Survival) on behalf of the Estate of William R. Murphy, Jr.

17.     As the "personal representative" of the Estate of William R. Murphy, Jr., William R. Murphy, III brings this action under 42 Pa Cons. Stat. § 8301 (Wrongful Death) and Pa. R. Civ. P. 2202(a) on his own behalf and on behalf of all wrongful death beneficiaries.

18.     The names and addresses of all persons legally entitled to recover damages for the wrongful death of William R. Murphy, Jr., and their relationships to him, are as follows:

3

| **Name** | **Address** | **Relationship** |
| --- | --- | --- |
| William R. Murphy, III | 9270 Windy Bush Lane<br>Breinigsville, PA 18031 | Son |
| Shannon M. Murphy | 500 75th Avenue N<br>Apartment 4<br>St. Petersburg, FL 33702 | Daughter |
| James P. Murphy | 518 East Logan Street<br>Bellefonte, PA 16823 | Son |

19.     At no time during his life did William R. Murphy, Jr. bring an action to recover damages for his personal injuries, and no other action has been filed to recover damages for the wrongful death of William R. Murphy, Jr.

**LIVING PLAINTIFF**

**I.      John Trowbridge**

20.     Plaintiff Lisa Krause is an adult individual with an address of 823 Spruce Street, Pottstown, Montgomery County, Pennsylvania 19464.

21.     Lisa Krause is the daughter and Attorney-in-Fact-of Plaintiff John Trowbridge.

22.     John Trowbridge is 87 years old and has been a resident at SEVC since 2015.

23.     Lisa Krause was appointed the Power-of-Attorney of John Trowbridge on December 3, 2015.

24.     As Power of Attorney, Lisa Krause is authorized to act on behalf of her father, John Trowbridge.

## PARTIES – DEFENDANTS

### I.     Pennsylvania Department of Military and Veterans Affairs
### as Owner and Operator of Southeastern Veterans' Center

25.     The Pennsylvania Department of Military and Veterans Affairs (hereinafter referred to as "DMVA") is a governmental agency operated by the Commonwealth of Pennsylvania, with government offices located at Building S-0-47, Fort Indiantown Gap, Annville, Lebanon County, Pennsylvania 17003.

26.     Defendant Southeastern Veterans' Center (hereinafter referred to as "SEVC") is a skilled nursing facility and personal care home located at 1 Veterans Drive, Spring City, Chester County, Pennsylvania 19475.

27.     At the time of the incidents pled herein, Defendant DMVA owned and operated Defendant SEVC as a long-term care facility and a personal care unit.

28.     DMVA and both its nursing facility/personal care home, SEVC, will collectively be referred to herein as "SEVC" for the remainder of this Complaint.

29.     SEVC provides skilled nursing services to our Commonwealth's veterans and their families.

30.     Additionally, SEVC maintains a personal care unit within the facility for veterans and their families.

31.     As such, SEVC provides personal care and personal care home medical services to our Commonwealth's veterans and their families.

32.     SEVC has a maximum capacity of 292 residents.[1]

---

[1] *Southeastern Veterans' Center,* DEPARTMENT OF MILITARY AND VETERANS AFFAIRS, COMMONWEALTH OF PENNSYLVANIA, https://www.dmva.pa.gov/paveteranshomes/SouthEasternVeteransCenter/Pages/default.aspx (last visited Oct. 12, 2020).

33.     SEVC's employees and agents provide health care and medical services to veteran residents such as Plaintiffs.

34.     SEVC operates as a "health care facility" under Pennsylvania's Heath Care Facilities Act, 35 P.S. §448.801 *et. seq.* which "promote[s] the public health and welfare through the establishment and enforcement of regulations setting minimum standards in the construction, maintenance and operation of health care facilities."

35.     At all relevant times, SEVC was, and is, a "long term care nursing facility" as that term is defined in 35 P.S. §448.802(a).

36.     Accordingly, at all relevant times, SEVC was a "health care provider" as that term is defined in the Medical Care Availability and Reduction of Error Act (MCARE), 40 P.S. § 1303.503.

37.     As a "health care provider" under the MCARE Act, SEVC is a "licensed professional" as defined by Pennsylvania Rule of Civil Procedure 1042.1, and Plaintiffs are asserting professional liability claims, in addition to other claims against this Defendant.

38.     Additionally, at all relevant times, SEVC was, and is, a "personal care home" as that term is defined in 55 Pa. Code § 2600.4.

39.     However, SEVC also served as a medical health care provider for the residents within its personal care unit when it arranged for medical services, especially when the facility went into "lockdown" at the height of the COVID-19 pandemic, as the personal care home residents began getting severely ill, as more thoroughly pled herein.

40.     At all relevant times, SEVC was acting independently and by and through its authorized agents, servants and employees who were then and there acting within the course and scope of their employment.

## II. Rohan Blackwood

41.     Defendant Rohan Blackwood (hereinafter referred to as "Blackwood" and/or "Defendant Blackwood") is an adult individual, who was employed by SEVC as the facility's Commandant. Claims in this action are asserted against Defendant Blackwood in his individual capacity.

42.     Defendant Blackwood was hired as SEVC's Commandant in or around 2015.

43.     On May 16, 2020, Defendant Blackwood was placed on indefinite suspension from his position as Commandant at SEVC, in part based upon the facts pled herein.

44.     Defendant Blackwood acted at all relevant times hereto within the scope of his employment and in his professional capacity as the Commandant of SEVC.

45.     As the Commandant at SEVC, Defendant Blackwood was responsible for overseeing and managing the facility to provide care to residents in accordance with current and applicable federal, state, and local standards, guidelines, and regulations that govern long term care facilities.

46.     As the Commandant at SEVC, Defendant Blackwood was further responsible for ensuring that quality care was provided to all residents at all times.

47.     Defendant Blackwood was therefore a health care employee who was employed by the Defendant DMVA as owner and operator of SEVC.

## III. Deborah Mullane

48.     Defendant Deborah Mullane (hereinafter referred to as "Defendant Mullane" and/or "Mullane") is an adult individual, who was employed by SEVC as the facility's Director of Nursing. Claims in this action are asserted against Defendant Mullane in her individual capacity.

49.     Defendant Mullane was hired by SEVC to serve as the facility's Director of Nursing (hereinafter "DON") beginning some time before 2019.

50.     Defendant Mullane was placed on indefinite suspension from her position as DON on May 26, 2020, in part based upon the facts pled herein.

51.     Defendant Mullane acted at all relevant times hereto within the scope of her employment and in her professional capacity as the DON of SEVC.

52.     As the DON at SEVC, Defendant Mullane was responsible for planning, organizing, developing, and directing the overall operation of the nursing services department in accordance with current federal, state, and local standards, guidelines, and regulations that govern the facility.

53.     As the DON at SEVC, Defendant Mullane also was responsible for ensuring that quality care was provided to all residents at all times.

54.     Defendant Mullane was therefore a health care employee who was employed by the Defendant DMVA as owner and operator of SEVC.

## **FACTUAL ALLEGATIONS**

### **I. Anthony Mottola, Deceased**

55.     Anthony Mottola (hereinafter "Mr. Mottola") was admitted to SEVC in 2016 for general help caring for himself after suffering from a stroke in 2008.

56.     Mr. Mottola's family would usually visit him once a week while he was living at SEVC because his family lived about an hour and a half away from the facility.

57.     However, in March of 2020 Mr. Mottola's family was informed that the facility would be suspending visitation due to COVID-19.

58.     Thereafter, Mr. Mottola's family conducted weekly phone calls with Mr. Mottola.

59.     Mr. Mottola was tested for COVID-19 at the end of March into early April of 2020, as SEVC informed his family that the facility had an abundance of tests and would be testing everyone. Mr. Mottola was negative for COVID-19 at this time.

60.     On May 12, 2020, Mr. Mottola's family had a telephonic family care meeting with SEVC staff, at which time Mr. Mottola was said to be doing well.

61.     About a week after this phone call, Mr. Mottola's arm was bothering him, and an x-ray was completed.

62.     The following day, SEVC staff called to let Mr. Mottola's family know that Mr. Mottola had a cough. A chest x-ray was conducted, and Mr. Mottola was diagnosed with pre-pneumonia. Mr. Mottola also was tested for COVID-19 this day.

63.     On May 16, 2020, SEVC staff called to inform Mr. Mottola's family that his COVID-19 test was positive.

64.     On May 18, 2020, a social worker at SEVC updated Mr. Mottola's family and said that Mr. Mottola was doing well.

65.     However, the next day, on May 19, 2020, a SEVC nurse called and informed the family that Mr. Mottola was having trouble breathing, required oxygen, and was placed on a morphine drip.

66.     On May 20, 2020, SEVC staff called to ask Mr. Mottola's family if they wanted Mr. Mottola sent to the hospital, as his condition continued to decline. Pursuant to Mr. Mottola's health care initiative, Mr. Mottola was a "do not resuscitate." Accordingly, the family declined to transfer Mr. Mottola to the hospital.

67.     Mr. Mottola died on May 21, 2020 at SEVC.

68.     Mr. Mottola's Death Certificate reflects that his causes of death were COVID-19, acute hypoxic respiratory failure, and pneumonia.

## II. William R. Murphy, Jr., Deceased

69.     William R. Murphy, Jr. (hereinafter "Mr. Murphy, Jr.") was admitted to SEVC on August 9, 2019 for nursing services, namely general help caring for himself, medication management, and rehabilitation for balance issues.

70.     On February 8, 2018, Mr. Murphy, Jr. was initially admitted to SEVC as a resident of the personal care unit after he was diagnosed with CNS lymphoma.

71.     As a personal care resident, Mr. Murphy, Jr. was permitted to leave SEVC, and he frequently went to Wawa. After one of his trips to Wawa, however, Mr. Murphy, Jr. was found in a ditch on SEVC's premises after being missing for several hours.

72.     Mr. Murphy, Jr. was sent to the hospital following this incident, but no one from SEVC called to inform William Murphy, III (hereinafter "Mr. Murphy, III") that his father had been missing or that he was being sent to the hospital.

73.     Following this incident, Mr. Murphy, Jr. was transferred to the skilled nursing unit of SEVC, specifically Wing 3E, where he remained for the duration of his stay during the COVID-19 pandemic.

74.     While a resident of SEVC's skilled nursing facility, Mr. Murphy, Jr. missed approximately four or five appointments with the Veteran's facility hospital where he was supposed to have his oncology follow-up appointments.

75.     On March 9, 2020, SEVC sent out letters to its residents' families regarding the COVID-19 precautions that it implemented, including halting visitations at the facility.

76.     On March 19, 2020, Mr. Murphy, III received an email from SEVC indicating that the facility did not have any COVID-19 positive residents or staff members.

77.     A few weeks later, on April 3, 2020, SEVC sent a letter to Mr. Murphy, III confirming that the facility had one or more confirmed COVID-19 cases within the facility.

78.     On April 8, 2020, Mr. Murphy, III received an email from a social worker at the facility named Melissa Hall stating that she would try to set up a video call between Mr. Murphy, III and his father.

79.     That same day, Mr. Murphy, III was informed that Wing 3E, where his father resided, had two or more positive cases and based upon SEVC's new policy, everyone else on the wing would be presumed positive. As such, SEVC determined that residents on the floor would no longer be tested for COVID-19.

80.     On April 9, 2020, Mr. Murphy, Jr. had a temperature of 99.8.

81.     After this first symptom developed, Mr. Murphy, Jr. quickly began developing other symptoms of COVID-19 but was never isolated or moved away from other residents. Additionally, pursuant to SEVC's "presumptive positive" policy, Mr. Murphy, Jr. was never tested for COVID-19.

82.     Thereafter, Mr. Murphy, Jr. continued to decline.

83.     SEVC staff asked Mr. Murphy, III if he wanted his father transferred to a hospital or hospice, but Mr. Murphy, III declined in accordance with Mr. Murphy, Jr.'s living will.

84.     During Easter weekend of 2020, despite numerous attempts, Mr. Murphy, III was unable to receive any updates from SEVC staff regarding his father's condition.

85.     On Monday, April 13, 2020, Mr. Murphy, III was informed that his father's oxygen levels were low.

86. Just a few days later, on April 20, 2020, Mr. Murphy, Jr. died at SEVC.

87. Mr. Murphy, Jr.'s Death Certificate reflects that his cause of death was COVID-19 and pneumonia.

### III. John Trowbridge, Living

88. John Trowbridge (hereinafter "Mr. Trowbridge") was admitted to SEVC in 2015.

89. Lisa Krause ("Ms. Krause"), Mr. Trowbridge's daughter, was not initially informed that Mr. Trowbridge's condition was declining due to COVID-19, but she knew he was not feeling well after speaking to him on the phone.

90. On April 15, 2020, Mr. Trowbridge went into Atrial Fibrillation ("A-Fib").

91. On April 16, 2020, Ms. Krause was informed by SEVC staff that her father had gone into A-Fib and needed to be taken to Pottstown Memorial Hospital. At this time, Mr. Trowbridge had not been tested for COVID-19 while at SEVC.

92. On April 17, 2020, while at Pottstown Memorial Hospital, Mr. Trowbridge tested positive for COVID-19.

93. Mr. Trowbridge remained at Pottstown Memorial Hospital for ten days while being treated for COVID-19. He was transferred back to SEVC on April 27, 2020.

94. Though Mr. Trowbridge survived COVID-19, he still has reciprocal effects of the virus that have drastically impacted his day-to-day life. Specifically, Mr. Trowbridge has a hard time breathing and can barely speak as a result of COVID-19.

**Facts Common to All Causes of Action**

**I. SEVC's COVID-19 Outbreak**

95.     On March 6, 2020, in response to the rising concern of COVID-19, Pennsylvania Governor Tom Wolf issued an Emergency Order which required Pennsylvania residents to stay at home unless they were essential workers.

96.     At the same time, the Pennsylvania Department of Health ("DOH"), issued new guidelines for its inspection of nursing facilities.[2]

97.     First, the DOH suspended all "regular" on-site inspections of health care facilities, even for facilities that had previously been cited for violating infection-control regulations.

98.     Next, the DOH limited its complaint-based inspections to only those situations where a facility was putting a resident in "immediate jeopardy." [3] "Immediate jeopardy" was defined as when a nursing home's "noncompliance has placed the health and safety of recipients in its care at risk for serious injury, serious harm, serious impairment or death."[4]

---

[2] The Pennsylvania Department of Health licenses skilled nursing facilities and long-term care facilities located in the Commonwealth of Pennsylvania. The DOH is also responsible for conducting regular and complaint-based inspections of the facilities it licenses to ensure that these facilities are complying with the mandatory requirements for operation. These mandatory requirements come from state and federal regulations that provide minimum standards for patient care. If the DOH finds that a nursing facility has violated a regulation, the DOH can issue a citation. A monetary fine may accompany this citation. The DOH will also require the nursing facility to submit a written plan to correct its deficiencies. The DOH will monitor the facility to ensure that deficiency is corrected.

[3] Candy Woodall, *As Coronavirus Deaths Increase, Pa. Nursing Homes Have Less State and Federal Oversight*, YORK DAILY RECORD (Apr. 24, 2020), https://www.ydr.com/story/news/2020/04/24/coronavirus-leads-pa-stop-routine-safety-inspections-nursing-homes/3016487001/.

[4] *State Operations Manuel Appendix Q – Core Guidelines for Determining Immediate Jeopardy*, CENTERS FOR MEDICARE AND MEDICAID SERVICES, (March 6, 2019) https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/som107ap_q_immedjeopardy.pdf.

99.     On March 9, 2020, SEVC placed its facilities on "lockdown" and visitors were no longer allowed inside the building to see residents.

100.    Notably, since the building was on lockdown, residents within the personal care unit were no longer able to leave the building. Accordingly, these residents depended on SEVC to, not only provide personal care services, but also to prevent them from contracting COVID-19, ensure they were healthy in their rooms, and provide medical care.

101.    On March 18, 2020, SEVC informed the residents' families that there were no active cases of COVID-19 in the facility.

102.    However, twelve days earlier, SEVC staff informed another resident's son, who is a named plaintiff in the previously filed related case against SEVC, Ian Horowitz, that the facility learned of the first resident to test positive for COVID-19 on March 6, 2020.

103.     On March 31, 2020, SEVC, again, reassured the residents' families the facility did not have any COVID-19 positive residents and it was following guidelines to ensure that all residents were safe.

104.    However, all throughout the month of March, as the virus began to spread across the world, SEVC still forced residents to eat in the cafeteria together.

105.    Even residents who began showing symptoms of COVID-19 were brought into the cafeteria to eat with other residents, thus, exposing the greater group of residents.[5]

---

[5] Pa. Auditor General Eugene A. DePasquale, *Protecting Our Protectors: A Review of State Veterans Homes,* PENNSYLVANIA AUDITOR GENERAL, (Dec. 2, 2020) https://www.paauditor.gov/Media/Default/Reports/RPT_DMVA_120220_FINAL.pdf [herein "Pa. Auditor General Report"].

106. Additionally, SEVC was not providing proper personal protective equipment to its employees; instead, employees working on the floors with infected residents were only given surgical masks, while administrators in offices used the protective N95 masks.[6]

107. SEVC staff later reported that they were given one mask for every five shifts they worked; however, SEVC administrators told the staff not to wear the masks around residents because it would scare the residents.[7]

108. On April 4, 2020, SEVC notified families that "one or more resident(s)" tested positive for COVID-19.

109. At the beginning of April, SEVC closed the cafeteria, but instead opened small recreation rooms for all of the residents to eat together on each floor.

110. Shortly thereafter, on April 17, 2020, the PHILADELPHIA INQUIRER released an article entitled: "Coronavirus has killed at least 10 at a state-run veteran's home in Chester County. The National Guard is on site."[8]

111. The above-mentioned article is how the residents' families first learned about the COVID-19 deaths at SEVC, as the facility did not notify, update, or inform any of the families regarding the spread of the virus.

112. The PHILADELPHIA INQUIRER informed the public that between April 9, 2020 and April 15, 2020, COVID-19 deaths within SEVC had climbed from one resident to nine residents,

---

[6] William Bender et al., *Inept Boss, Altered Records, Ignored Warnings at Pa. Vets' Nursing Home with 38 COVID Deaths,* THE PHILADELPHIA INQUIRER, (last updated May 30, 2020), https://www.inquirer.com/news/southeastern-veterans-center-coronavirus-deaths-chester-county-nursing-home-rohan-blackwood-20200530.html.

[7] Pa. Auditor General Report, *supra* note 5.

[8] Bender et al., *supra* note 6.

and the tenth resident died a few short days later. By mid-April, as many as four residents were dying per day.[9]

113.    During this same time frame, nineteen SEVC staff members also tested positive for the virus.

114.    On Wednesday April 15, 2020, the National Guard sent 30 members into SEVC in an attempt to help the facility stop the spread of the virus.

115.    While the number of infected staff and residents began to rise, SEVC implemented a procedure to halt the testing of residents who resided in a unit with two or more COVID-19 positive residents. SEVC determined that all residents within these units, whether they had symptoms or not, were "presumed" to be positive, notwithstanding the absence of tests.

116.    On April 18, 2020, SEVC sent an email to the residents' families stating that the facility had "several positive cases of COVID-19 in our building," but the facility did not disclose any of the numerous deaths that had occurred. In this email, SEVC stated that "if any resident test positive here at the home, the family will immediately be notified."

117.    By April 19, 2020, the Chester County Coroner confirmed that Chester County had fifty-two COVID-19 deaths, thirty-two of those deaths occurred between April 10, 2020 and April 16, 2020.

118.    On April 19, 2020 the Centers for Medicare & Medicaid Services (hereinafter "CMS") announced new regulatory requirements for nursing homes, which required facilities to inform all residents and their families of COVID-19 cases within their facilities. CMS then reported those cases to the Centers for Disease Control and Prevention (hereinafter "CDC").[10]

---

[9] Bender et al., *supra* note 6.
[10] Press Release, CENTERS FOR MEDICARE & MEDICAID SERVICES, *Trump Administration Announces New Nursing Homes COVID-19 Transparency Effort* (Apr. 19, 2020),

119.    By April 26, 2020, SEVC had twenty-seven COVID-19 deaths—the most of any nursing facility in Chester County. By these statistics, SEVC's death toll nearly tripled in a 5-day period.

120.    On April 28, 2020, state and local officials began calling for an "immediate investigation" into SEVC's handling of COVID-19. These officials included: Senator Katie Muth, the Chester County Coroner, Christina VandePol, and State Auditor General, Eugene DePasquale.[11]

121.    A statement released by Senator Katie Muth on April 28, 2020 follows:

> The situation at the Southeast Veterans is absolutely unacceptable. For the last three weeks, I've received calls and emails from concerned family members, worried about their loved ones, asking questions about what's being done to stop further spread of this virus. Long-term care facilities, like SEVC, are struggling to keep the virus from infecting both residents and staff, and with inadequate testing capacity and unreliable supply chains for personal protective equipment (PPE), this struggle becomes even more challenging.  There are many unanswered questions about the surge of cases and deaths at the center, and without answers of substance, it's clear that the current plan is failing.[12]

122.    Also, on April 28, 2020, Coroner VandePol was quoted stating:

> "The sheer number of deaths at the Veterans' Center in such a short period of time warrants an immediate investigation. We have no idea what is going on there or how this outbreak is being handled. Are all COVID-19 deaths being reported to us, as they should be by

---

https://www.cms.gov/newsroom/press-releases/trump-administration-announces-new-nursing-homes-covid-19-transparency-effort.

[11] Vinny Vella & William Bender, THE PHILADELPHIA INQUIRER, '*We Have No Idea What Is Going on There': Pa. and Local Officials Call for Probe of Veterans' Nursing Home* (Apr. 28, 2020), https://www.inquirer.com/news/southeastern-veterans-center-cheter-county-investigation-seniors-covid-coronavirus-20200428.html.

[12] Press Release, SENATOR KATIE MUTH, *State Sen. Muth, Chester County Coroner VandePol Call for Immediate Investigation into Chester County Southeast Veterans Center amidst Growing COVID-19 Concerns* (Apr. 28, 2020), https://www.senatormuth.com/state-sen-muth-chester-county-coroner-vandepol-call-for-immediate-investigation-into-chester-county-southeast-veterans-center-amidst-growing-covid-19-concerns/ [hereinafter Senator Muth Press Release].

law? It appears that since Monday, April 27, they are no longer being reported to my office. Are there deaths written off as due to other causes because the residents are not being tested? Are appropriate safety precautions in place for residents and staff? I've been informed the State has suspended inspections of long-term care facilities as well as ombudsman programs. Families have little or no access to their loved ones, either. So, this is a closed system with no one able to see what is going on. That's a recipe for disaster."[13]

123.    On April 29, 2020, Senator Muth shared that she had been in contact with SEVC staff. Staff disclosed to Muth that the facility falsified documents, improperly tested residents and staff, lacked isolation for positive residents, and intimidated staff in an effort to prevent them from alerting officials regarding the reality of SEVC's handling of the virus.[14]

124.    Following the growing concern from families and state officials, SEVC's Commandant, Defendant Blackwood, held a staff meeting forbidding any staff from speaking to Senator Muth or with any family member who has spoken to the media.

125.    After Defendant Blackwood's intimidation of the staff at the meeting, staff members were fearful of being fired if they spoke about the conditions within SEVC.[15]

126.    Residents' families were fearful of retaliation from Defendant Blackwood as well because he had a history among residents' families of threating them if they questioned his authority.[16]

---

[13] Bender et al., *supra* note 6.

[14] Jeff Cole, Fox 29 Philadelphia, *Officials Call For "Immediate Investigation" of Chester County Nursing Home over COVID-19 Concerns,* Fox 29 Philadelphia, (Apr 29, 2020), https://www.fox29.com/news/officials-call-for-immediate-investigation-of-chester-county-nursing-home-over-covid-19-concerns.

[15] Bender et al., *supra* note 6.

[16] Bender et al., *supra* note 6.

127.   On May 2, 2020, Defendant Blackwood sent a letter to the residents' families which stated that the media had misrepresented the situation inside of the facility, and SEVC attempted to reassure the residents' families that their loved ones were safe.

128.   Furthermore, SEVC was vastly understaffed before and during the COVID-19 pandemic. Many attributed the understaffing to Defendant Blackwood and the working conditions he created.[17]

129.   As the facility's number of positive COVID-19 residents continued to rise, on May 12, 2020, Pennsylvania Attorney General Josh Shapiro announced that his office had opened criminal investigations into "several nursing homes," but did not specify how many facilities, which facilities, or any specific allegations.

130.   On May 21, 2020, plaintiff in a related matter, Ian Horowitz, received a telephone call from Michael Collins of the Pennsylvania Attorney General's Office (hereinafter "AG's Office"). Mr. Collins explained to Mr. Horowitz that the AG's Office wanted to speak with SEVC's staff in order to collect more information regarding the state of SEVC; therefore, Mr. Collins asked that Mr. Horowitz give his contact information for SEVC's staff to the AG's Office.

131.   As of May 20, 2020, SEVC had forty-seven COVID-19 deaths, all of which occurred after April 1, 2020. The death rate at SEVC during this time is drastically higher than the facility's average rate of 1.2 deaths per month.[18]

132.   On May 20, 2020, SEVC sent a letter to the residents' families which stated that it began to test all residents and staff for COVID-19.

---

[17] Bender et al., *supra* note 6.
[18] Evan Brandt, *Despite High Death Roll, Inspections Reveal No Missteps at Southeast Veterans Center,* THE MERCURY, (Apr 29, 2020), https://www.pottsmerc.com/news/despite-high-death-roll-inspections-reveal-no-missteps-at-southeast-veterans-center/article_a894a32a-9096-11ea-b786-a7878ba4dcaf.html.

133. However, staff informed Mr. Horowitz that the facility was not actually testing the residents as the letter claimed.

134. On May 23, 2020, SEVC sent an email to the residents' families informing them that ninety-nine residents and forty-one staff members had tested positive for COVD-19.

135. On May 26, 2020, SEVC Commandant, Rohan Blackwood, and the Director of Nursing, Deborah Mullane, were both placed on indefinite suspension from the facility.

136. By May 30, 2020, SEVC had over 110 COVID-19 positive residents between its skilled nursing facility and its personal care unit.

137. Tom Tosti, an officer of the American Federation of State, County, and Municipal Employees ("AFSCME"), the union that represents VA facility nurses, stated that the State Bureau of Veterans Homes began investigating complaints made in April of 2020 regarding working conditions, but interviews took longer than expected and had to be relocated, as staff were afraid that they would be fired for speaking with investigators.

138. As of October 14, 2020, the Department of Human Services reported that SEVC's personal care unit had a total of 25 COVID-19 positive residents, of which, 6 residents died.[19]

139. As of December 8, 2020, the DOH reported that SEVC's skilled nursing facility had a total of 111 COVID-19 positive residents, of which, 42 residents died.[20]

---

[19] COVID-19 Personal Care and Assisted Living Data—*COVID-19 Cases Associated with Nursing Homes and Personal Care Homes to Date by Facility Name,* DEPARTMENT OF HEALTH AND HUMAN SERVICES (Sept. 15, 2020), https://sais.health.pa.gov/CommonPOC/Content/PublicWeb/PDF/PQ881191346361000L.PDF [hereinafter DHS COVID Personal Care Data].

[20] COVID-19 Long-Term Care Facility Data-- *COVID-19 Cases Associated with Nursing Homes and Personal Care Homes to Date by Facility Name,* DEPARTMENT OF HEALTH AND HUMAN SERVICES (Dec. 8, 2020), https://sais.health.pa.gov/CommonPOC/Content/PublicWeb/PDF/PQ881191346361000L.PDF [hereinafter DOH COVID Long-Term Care Data].

140.   The DOH reported that SEVC had 71 COVID-19 positive employees as of December 8, 2020.[21]

141.   Statistically, SEVC's COVID-19 numbers are an outlier when compared to other state-run veteran's facilities. The Department of Veterans Affairs has five other facilities within the Commonwealth. Pursuant to the December 8, 2020, each of the five other state-run facilities have fewer than fifteen COVID-19 related deaths.

## II. The Department of Health Investigation

142.   Following numerous complaints about SEVC's handling of COVID-19, the Pennsylvania Department of Health conducted an on-site inspection of SEVC over the course of several days, concluding on June 9, 2020.

143.   The DOH's inspection included reviewing SEVC's written policies and procedures, observing staff providing care to residents, and interviewing staff.

144.   As a result of this inspection, the DOH cited SEVC for numerous infractions and deficiencies, including SEVC's non-compliance with federal requirements for infection control. The DOH found that SEVC "failed to implement the CMS and CDC recommended practices for COVID-19 and to prevent the potential for cross contamination of infection."[22]

145.   The DOH determined the following:

the facility failed to ensure that policies and procedure were in place to trace and investigate COVID-19 presumptive positive and positive residents and staff to mitigate or potentially control the spread of the coronavirus, failed to follow CDC (Center for Disease Control) guidelines, CMS (Center for Medicare/Medicaid Services) guidelines and Pennsylvania Department of Health (DOH)

---

[21] DOH COVID Long-Term Care Data, *supra* note 20.
[22] *DOH Statement of Deficiencies and Plan of Correction (POC)*, DEPARTMENT OF HEALTH AND HUMAN SERVICES HEALTH CARE FINANCING ADMINISTRATION (June 9, 2020), https://sais.health.pa.gov/CommonPOC/Content/PublicWeb/PDF/PQ881191346361000L.PDF [hereinafter DOH POC] (Attached as Exhibit 1).

guidelines to reduce the spread of infections and prevent cross-contamination during the COVID-19 pandemic…[23]

146.    The DOH also concluded that 128 of the 154 residents in the facility were in "Immediate Jeopardy."[24]

147.    The DOH reported the following from its interviews and observations of SEVC employees:

a.    "An observation on June 1, 2020, at 8:10 a.m. of the screening process revealed no social distancing at the entrance to the building and no screening questionnaire form was used by the security guard at the entrance to the building."

b.    "Interview on June 1, 2020, at 9:55 a.m. with the Infection Preventionist (Employee 2) revealed that not all of the staff had been fit tested [A process in which people who are required to wear negative-pressure respirators (i.e. N95) are examined with a rigorous protocol in which the tester challenges the face-to-face piece seal with a chemical agent]."

c.    "June 2, 2020, at 8:20 a.m. interview with the Acting Commandant revealed CDC guidelines were not followed when residents who were tested positive and after timeline (14 days) were left on a positive unit. There was no tracing or tracking in place."

d.    "Interview with NA 3 on June 2, 2020, at 10:15 a.m. confirmed that staff have been pulled from positive to negative units and back the same day. NA 3 stated, 'Sometimes when I come in there isn't any PPE. I know they have it, but why do we have to beg for stuff that we have to wear, or we get PDC'd (Preliminary Disciplinary Committee). We had to take care of positive residents without being fit tested. The fit testing just started a week ago.'"

e.    "During an interview with LPN 2 on June 2, 2020, at 10:25 a.m. it was stated, 'that we will be fired for talking to you.

[23] DOH POC, *supra* note 22, Ex. 1.
[24] DOH POC, *supra* note 22, Ex. 1.

Watching people die was awful. We were told to wrap the residents in a body bag and meet the undertaker at the elevator.'"

f.      "NA 3 went on to say no one from administration came on the floor because they didn't want to put gear on. What makes them better than us? There was a girl who was positive and worked the entire time. They also kept the residents in the dining rooms too long. We had problems, we knew some residents had something, but no one would do anything. We weren't allowed to wear PPE, or we would get written up. We were told it would scare the residents."

g.      "On June 2, 2020, at 10:35 a.m. an interview with NA 4 revealed that she observed Employee 2 enter a positive room with no gown and mask on. Then was off for two weeks."

h.      "NA 2 revealed that no testing was done before April 5, 2020, because of arrogance. Resident 4A and Resident 13A were first tested. I tested positive on April 10, 2020, but back at work on April 12, 2020."

i.      "During an interview with NA 2, she was asked, are you to be wearing a mask? NA [2]'s [sic] response was "I was hot, so I took it off. I just masked up and I can't breathe." The 4 CLC B is a COVID-19 positive unit."

148.    The DOH cited SEVC for the following violations:

a.      Maintaining residents on units with COVID-19 positive residents when their testing was negative;

b.      Failing to have a policy or protocol for the management of COVID-19 positive and negative residents;

c.      Placing male and female residents in the same room without notifying or receiving consent from responsible parties;

d.      Failing to ensure that resident's representatives were notified about changes in condition and treatment;

e.      Failing to maintain clinic records that were complete and accurately documented, specifically staff documented COVID-19 testing in the wrong residents' files;

23

f.      Failing to ensure that designated interdisciplinary team member obtained the required information from the contracted hospice provider;

g.      Failing to make certain, prior to the COVID-19 outbreak, that the Commandant, Defendant Blackwood, and Director of Nursing, Defendant Mullane, were in attendance for quarterly Quality Assurance Process Improvement Committee meetings for two of four quarters, specifically July 2019 and April 2020;

h.      Failing to ensure that policies and procedures were in place to trace and investigate COVID-19 presumptive positive and positive residents and staff to mitigate or potentially control the spread of COVID;

i.      Failing to follow CDC, CMS, and DOH guidelines to reduce the spread of infections and prevent cross contamination;

j.      Failing to test residents and staff at all prior to April 5, 2020;

k.      Failing to end communal dining before April 1, 2020;

l.      Failing to adequately test staff, specifically only 21% of staff had been tested since May 28, 2020;

m.      Failing to follow proper social distancing protocols at entrance of the facility and failed to have security use a screening questionnaire for entrance;

n.      Failing to properly fit test all staff with protective N95 masks; and,

o.      Allowing employees to work on both COVID-19 positive and negative units during the same day.

149.    The DOH additionally determined that the Commandant, Defendant Blackwood, and the Director of Nursing, Defendant Mullane, "did not effectively manage the facility to make certain that proper infection control procedures were followed to protect residents from cross-contamination, infection, virus, and disease in the facility."[25]

---

[25] DOH POC, *supra* note 22, Ex. 1.

24

150.    The DOH concluded that the Commandant, Defendant Blackwood, and the Director of Nursing, Defendant Mullane, "failed to fulfill their essential job duties to ensure that the federal and state guidelines and regulations were followed."[26]

151.    Commandant, Defendant Blackwood, and the Director of Nursing, Defendant Mullane, failed to fulfill their essential job duties to ensure that federal and state guidelines and regulations were followed. They also failed to maintain an infection prevention and control program which placed residents in immediate jeopardy.[27]

152.    More specifically, Defendant Blackwood and Defendant Mullane:

   a.    Failed to ensure proper screening of staff entering the building;

   b.    Failed to implement tracing and investigation of positive COVID-19 residents and staff;

   c.    Failed to ensure that multi-use equipment was properly cleaned and disinfected; and,

   d.    Failed to ensure staff had access to and used proper PPE, used proper hand-hygiene, and properly stored/handled linens to prevent the potential for cross contamination of disease.[28]

153.    As evidenced above, the DOH found that SEVC failed to have proper policies and procedures in place regarding infection prevention prior to the COVID-19 pandemic, failed to have proper staffing in place prior to the COVID-19 pandemic, and failed to have proper leadership prior to the COVID-19 pandemic, and, as a result, these aforementioned failures led to the

---

[26] DOH POC, *supra* note 22, Ex. 1.
[27] Senator Muth Press Release, *supra* note 12.
[28] DOH POC, *supra* note 22, Ex. 1.

25

mishandling of the pandemic and resulted in SEVC putting 128 of the 154 residents in "immediate jeopardy."[29]

## COUNT I:
## VIOLATION OF CIVIL RIGHTS ENFORCEABLE PURSUANT TO 42 U.S.C. § 1983 –
## Cruel and Unusual Punishment
### (All Plaintiffs vs. Rohan Blackwood)

154.    The averments of the previous paragraphs are incorporated by reference as if fully set forth.

155.    Section 1983 provides that: "every person who, under color of [law] of any State. . . subjects, or causes to be subjected, any [person] to the deprivation of any rights. . . secured by the Constitution and laws, shall be liable to the party injured in an action at law. . ." 42 U.S.C. § 1983.

156.    Actions against state officials seeking redress for violations of constitutional rights may be brought under 42 U.S.C. § 1983.

157.    Plaintiffs are "persons" within the meaning of 42 U.S.C. § 1983.

158.    Defendant Blackwood acted in his official capacity as Commandant of SEVC, a state-run facility, and was, therefore, acting under the color of state law. Defendant Blackwood's actions and inactions violated Plaintiffs' Eighth Amendment rights, made applicable to the states under the Fourteenth Amendment, which is actionable under 42 U.S.C. § 1983.

159.    Under the Eighth Amendment to the United States Constitution, made applicable to the states pursuant to the Fourteenth Amendment, government agencies are prohibited from subjecting citizens to cruel and unusual punishment. Actions of government officials

---

[29] DOH POC, *supra* note 22, Ex. 1.

demonstrating deliberate indifference to the serious medical needs of U.S. citizens represents cruel and unusual punishment, as established in *Estelle v. Gamble,* 429 U.S. 97 (1976).

160.    Residents of skilled nursing facilities, specifically including Plaintiffs herein, rely on the facility, and therefore on the facility's administrators, to attend to their medical needs.

161.    Under normal circumstances, if necessary, residents of skilled nursing facilities could leave the facility to seek medical care if adequate care was not being properly provided by the facility.

162.    However, during the COVID-19 pandemic, and at all times relevant hereto, residents, including Plaintiffs, were not permitted exit the facility due to lockdown procedures.

163.    Furthermore, the families of residents, including Plaintiffs, were not permitted to enter the building to check on the level of care their loved ones were receiving.

164.    As such, nursing and personal care staff of SEVC were the sole providers of medical services to skilled and personal care residents during the lockdown periods from early March until very recently or even presently.

165.    Residents had absolutely no ability to seek, solicit, or find alternative medical care when the Defendants failed to provide adequate and basic care, or often failed to provide care altogether, which ultimately amounted to cruel and unusual punishment under the Eighth Amendment, made actionable under the Fourteenth Amendment.

166.    The actions of Defendant Blackwood detailed above violated Plaintiffs' rights under the United States Constitution. In short, it was not objectively reasonable for Defendant Blackwood to ignore the serious medical problems and risks presented by the COVID-19 outbreak among a vulnerable population and refuse to take appropriate and necessary measures to prevent

such an outbreak. In fact, Defendant Blackwood's actions demonstrate a deliberate indifference to Plaintiffs' serious medical needs.

167.    There should have been policies and procedures in place, both before and during the pandemic, to ensure that Plaintiffs' medical needs, along with all other SEVC residents' needs, were being properly considered and evaluated. All of the aforementioned deficiencies establish not only deliberate indifference on the part of Defendant Blackwood, but actual malice with respect to Plaintiffs' life-threatening, and ultimately fatal as it relates to Plaintiffs Mottola and Murphy, medical conditions.

168.    Defendant Blackwood intentionally ignored and/or was deliberately indifferent to the need for appropriate policies and procedures of SEVC's the handling of COVID-19. Further, he intentionally ignored Plaintiffs' needs for medical attention. Defendant Blackwood intentionally deprived Plaintiffs of their constitutional right to medical treatment which ultimately caused the deaths of Plaintiffs Mottola and Murphy, and serious medical harm of Plaintiff Trowbridge. The actions and inactions of Defendant Blackwood represent a violation of Plaintiffs' rights under the Eighth Amendment to the United States Constitution.

169.    Defendant Blackwood's actions were motivated by bad faith and malice as he intentionally subjected the Plaintiffs to the spread of the virus, and he willfully denied Plaintiffs timely medical assistance after they became ill which could have saved Plaintiffs Mottola and Murphy's lives.

170.    The aforementioned deliberate indifference to Plaintiffs' serious medical needs was consistent with SEVC's custom and policy of providing inadequate medical care to residents, which was developed and implemented by Defendant Blackwood.

171.    The deliberate indifference of the Defendant Blackwood included, but was not limited to the following:

a.    Intentionally failing to establish and maintain a policies and procedures to prevent the spread of COVID-19;

b.    Intentionally understaffing the facility;

c.    Failing to implement social distancing procedures among residents, staff, and visitors;

d.    Failing to implement any sort of quarantine procedures when residents were showing symptoms of the virus or were exposed to the virus;

e.    Failing to assess and treat the symptoms of sick residents;

f.    Failing to send residents to the hospital when their conditions worsened;

g.    Failing to notify families of residents' changing conditions;

h.    Failing to notify families regarding the status of the spread of the virus within the facility;

i.    Lying to the families regarding the number of sick residents in the facility;

j.    Lying to the families by stating their loved ones were healthy while the residents were showing severe symptoms of the virus;

k.    Instructing staff to lie to families regarding residents' conditions;

l.    Instructing staff to not allow any resident to go to the hospital despite the urgency of the residents' conditions;

m.    Denying staff members personal protective equipment;

n.    Denying residents personal protective equipment;

o.    Refusing to permit staff to speak to families and/or the media/public regarding the status of the virus within the facility;

29

p.      Refusing to permit staff to speak to the Pennsylvania Department of Health;

q.      Failing to properly keep families, outside medical professionals, the Pennsylvania Department of Health, and the general public up to date with the health situation inside the facility;

r.      Failing to test any resident within the facility for COVID-19 for several weeks;

s.      Failing to track the contact spread of the virus;

t.      Creating an extreme risk of exposure and danger to residents by presuming the entire facility, all residents, and all staff were positive for COVID-19 when in fact they were not all infected;

u.      Failing to test employees within the facility;

v.      Moving employees from COVID-19 positive floors to COVID-19 negative floors within the same shift;

w.      Falsifying records;

x.      Intentionally failing to provide adequate staff training and education on infection prevention and control;

y.      Failing to oversee the facility in providing care to residents; and,

z.      Failing to request assistance from the proper authorities when it became apparent that COVID-19 was spreading throughout the facility.

172.    As a direct and proximate result of the unconstitutional acts as described above, Plaintiffs were irreparably injured as a result of Defendant Blackwood's actions, and Plaintiffs Mottola and Murphy died as a result of Defendant Blackwood's actions.

WHEREFORE, Plaintiffs Lawrence Mottola, Individually and as Executor of the Estate of Anthony Mottola, Deceased; William R. Murphy, III, Individually and as Administrator of the

Estate of William R. Murphy, Jr., Deceased; and Lisa Krause, as Attorney-in-Fact of John Trowbridge, claim damages of Defendant Blackwood, and demand compensatory and punitive damages from the Defendant in an amount in excess of the jurisdictional arbitration limits, together with interest, and any other relief this Honorable Court deems appropriate.

**COUNT II:**
**VIOLATIONS OF CIVIL RIGHTS ENFORCEABLE PURSUANT TO 42 U.S.C. § 1983 –**
**Cruel and Unusual Punishment**
**(All Plaintiffs vs. Deborah Mullane)**

173.     The averments of the previous paragraphs are incorporated by reference as if fully set forth.

174.     Section 1983 provides that: "every person who, under color of [law] of any State. . . subjects, or causes to be subjected, any [person] to the deprivation of any rights. . . secured by the Constitution and laws, shall be liable to the party injured in an action at law. . ." 42 U.S.C. § 1983.

175.     Actions against state officials seeking redress for violations of constitutional rights may be brought under 42 U.S.C. § 1983.

176.     Plaintiffs are "persons" within the meaning of 42 U.S.C. § 1983.

177.     Defendant Mullane acted in her official capacity as DON of SEVC, a state-run facility, and was, therefore, acting under the color of state law. Defendant Mullane's actions and inactions violated Plaintiffs' Eighth Amendment rights, made applicable to the states under the Fourteenth Amendment, which is actionable under 42 U.S.C. § 1983.

178.     Under the Eighth Amendment to the United States Constitution, made applicable to the states pursuant to the Fourteenth Amendment, government agencies are prohibited from subjecting citizens to cruel and unusual punishment. Actions of government officials

demonstrating deliberate indifference to the serious medical needs of U.S. citizens represents cruel and unusual punishment, as established in *Estelle v. Gamble,* 429 U.S. 97 (1976).

179.    Residents of skilled nursing facilities, specifically including Plaintiffs herein, rely on the facility, and therefore on the facility's administrators, to attend to their medical needs.

180.    Under normal circumstances, if necessary, residents of skilled nursing facilities could leave the facility to seek medical care if adequate care was not being properly provided by the facility.

181.    However, during the COVID-19 pandemic, and at all times relevant hereto, residents, including Plaintiffs, were not permitted to exit the facility due to lockdown procedures.

182.    Furthermore, the families of residents, including Plaintiffs, were not permitted to enter the building to check on the level of care their loved ones were receiving.

183.    As such, nursing and personal care staff were the sole providers of medical services to skilled and personal care residents during the lockdown periods from early March until very recently or even presently.

184.    Residents had absolutely no ability to seek, solicit, or find alternative medical care when the Defendants failed to provide adequate and basic care, or often failed to provide care altogether, which ultimately amounted to cruel and unusual punishment under the Eighth Amendment, made actionable under the Fourteenth Amendment.

185.    The actions of Defendant Mullane detailed above violated Plaintiffs' rights under the United States Constitution. In short, it was not objectively reasonable for Defendant Mullane to ignore the serious medical problems and risks presented by the COVID-19 outbreak among a vulnerable population and refuse to take appropriate and necessary measures to prevent such an

outbreak. In fact, Defendant Mullane's actions demonstration a deliberate indifference to Plaintiffs' serious medical needs.

186.    There should have been policies and procedures in place, both before and during the pandemic, to ensure that Plaintiffs' medical needs, along with all other SEVC residents' needs, were being properly considered and evaluated. All of the aforementioned deficiencies establish not only deliberate indifference on the part of Defendant Mullane, but actual malice with respect to Plaintiffs' life-threatening, and ultimately fatal as it relates to Plaintiffs Mottola and Murphy, medical conditions.

187.    Defendant Mullane intentionally ignored and/or was deliberately indifferent to the need for appropriate policies and procedures within SEVC for the handling of COVID-19. Further, she intentionally ignored Plaintiffs' needs for medical attention. Defendant Mullane intentionally deprived Plaintiffs of their constitutional right to medical treatment which ultimately caused the deaths of Plaintiffs Mottola and Murphy, and serious medical harm of Plaintiff Trowbridge. The actions and inactions of Defendant Mullane represent a violation of Plaintiffs' rights under the Eighth Amendment to the United States Constitution.

188.    Defendants Mullane's actions were motivated by bad faith and malice as she intentionally subjected the Plaintiffs to the spread of the virus, and she willfully denied Plaintiffs timely medical assistance after they became ill, which could have saved Plaintiffs Mottola and Murphy's lives.

189.    The aforementioned deliberate indifference to Plaintiffs' serious medical needs was consistent with SEVC's custom and policy of providing inadequate medical care to residents, which was developed and implemented by Defendant Mullane.

190.    The deliberate indifference of the Defendant Mullane included, but was not limited to the following:

   a.    Intentionally failing to establish and maintain a policies and procedures to prevent the spread of COVID-19;

   b.    Intentionally understaffing the facility;

   c.    Failing to implement social distancing procedures among residents, staff, and visitors;

   d.    Failing to implement any sort of quarantine procedures when residents were showing symptoms of the virus or were exposed to the virus;

   e.    Failing to assess and treat the symptoms of sick residents;

   f.    Failing to send residents to the hospital when their conditions worsened;

   g.    Failing to notify families of residents' changing conditions;

   h.    Failing to notify families regarding the status of the spread of the virus within the facility;

   i.    Lying to the families regarding the number of sick residents in the facility;

   j.    Lying to the families by stating their loved ones were healthy while the residents were showing severe symptoms of the virus;

   k.    Instructing staff to lie to families regarding residents' conditions;

   l.    Instructing staff to not allow any resident to go to the hospital despite the urgency of the residents' conditions;

   m.    Denying staff members personal protective equipment;

   n.    Denying residents personal protective equipment;

   o.    Refusing to permit staff to speak to families and/or the media/public regarding the status of the virus within the facility;

p. Refusing to permit staff to speak to the Pennsylvania Department of Health;

q. Failing to properly keep families, outside medical professionals, the Pennsylvania Department of Health, and the general public up to date with the health situation inside the facility;

r. Failing to test any resident within the facility for COVID-19 for several weeks;

s. Failing to track the contact spread of the virus;

t. Creating an extreme risk of exposure and danger to residents by presuming the entire facility, all residents, and all staff were positive for COVID-19 when in fact they were not all infected;

u. Failing to test employees within the facility;

v. Moving employees from COVID-19 positive floors to COVID-19 negative floors within the same shift;

w. Falsifying records;

x. Intentionally failing to provide adequate staff training and education on infection prevention and control;

y. Failing to oversee the facility in providing care to residents; and,

z. Failing to request assistance from the proper authorities when it became apparent that COVID-19 was spreading throughout the facility.

191. As a direct and proximate result of the unconstitutional acts as described above, Plaintiffs were irreparably injured as a result of Defendant Mullane's actions, and Plaintiffs Mottola and Murphy died as a result of Defendant Mullane's actions.

WHEREFORE, Plaintiffs Lawrence Mottola, Individually and as Executor of the Estate of Anthony Mottola, Deceased; William R. Murphy, III, Individually and as Administrator of the

Estate of William R. Murphy, Jr., Deceased; and Lisa Krause, as Attorney-in-Fact of John Trowbridge, claim damages of Defendant Mullane, and demand compensatory and punitive damages from the Defendant in an amount in excess of the jurisdictional arbitration limits, together with interest, and any other relief this Honorable Court deems appropriate.

## COUNT III:
## DEPRAVATION OF CIVIL RIGHTS PROTECTED UNDER FEDERAL NURSING HOME REFORM ACT ("FNHRA")
### (All Plaintiffs vs. Rohan Blackwood)

192.    The averments of the previous paragraphs are incorporated by reference as if fully set forth.

193.    Defendant Blackwood was an agent of the Commonwealth of Pennsylvania via his position as Commandant of SEVC, a facility operated by the Department of Veterans Affairs. Accordingly, at all times material hereto, Defendant Blackwood was acting under color of state law.

194.    Defendant Blackwood is bound generally by the 1987 Omnibus Budget Reconciliation Act ("OBRA") and the Federal Nursing Home Reform Act ("FNHRA"), which is contained within the 1987 OBRA. *See:* 42 U.S.C. § 1396r; 42 U.S.C. § 1396a(w) (as incorporated by 42 U.S.C. § 1396(r).) Defendant Blackwood is also bound generally by the OBRA/FNHRA implementing regulations found at 42 C.F.R. § 483, *et seq.*, which served to define specific statutory rights set forth in the above-mentioned statutes.

195.    The specific detailed regulatory provisions as well as the statutes in question create rights for Plaintiffs, which are enforceable pursuant to 42 U.S.C. 1983, as the language of these regulations and statutory provisions clearly and unambiguously creates those rights.

196.    Defendant Blackwood, in derogation of the above statute and regulations, and as a custom and policy, failed to comply with the aforementioned regulations as follows:

a.  By failing, as a custom and policy, to ensure that residents, including Plaintiffs, did not suffer verbal, physical and mental abuse as required by 42 U.S.C.A. § 1396r(c)(1)(A)(ii) and amplified by 42 C.F.R. § 483.13(b), as pled herein;

b.  By failing, as a custom and policy, to care for residents, including Plaintiffs, in a manner that promoted maintenance or enhancement of their lives, as required by 42 U.S.C.A. § 1396r(b)(1)(A), as pled herein;

c.  By failing, as a custom and policy, to develop a comprehensive plan of care for residents, including Plaintiffs, to meet the residents' medical, nursing, and psychosocial needs, as required by 42 U.S.C.A. § 1396r(b)(2)(A) and amplified by 42 C.F.R. §483.20(b), as pled herein;

d.  By failing, as a custom and policy, to provide residents, including Plaintiff, the necessary care and services to allow them to attain or maintain the highest, practicable, physical, mental and psychosocial well-being, as required 42 U.S.C.A. § 1396r(b)(2) and amplified by 42 C.F.R. § 483.25, as pled herein;

e.  By failing, as a  custom and policy, to periodically review and revise resident's written plan of care by an interdisciplinary team after each of the resident's assessments, as described within 42 U.S.C.A. §1396r(b)(3)(A) and as required by 42 U.S.C.A. § 1396r(b)(2)(C), as pled herein;

f.  By failing, as a custom and policy, to conduct an assessment of  residents, such as Plaintiffs, promptly after a significant change in the resident's physical or mental condition occurs, as required by 42 U.S.C.A. §1396r(b)(3)(A) and 42 U.S.C.A. §1396r(b)(3)(C)(i)(II), as pled herein;

g.  By failing, as a custom and policy, to use the results of the assessments required and as described above in developing, reviewing and revising the residents' plan of care, such as Plaintiffs, as required by 42 U.S.C.A. § 1396r(b)(3)(D), as pled herein;

h.  By failing, as a custom and policy, to ensure that residents, including Plaintiffs, were provided medically-related social

services to attain or maintain the highest practicable physical, mental and psychosocial well-being, as required by 42 U.S.C.A. § 1396r(b)(4)(ii), as pled herein;

i.  By failing, as a custom and policy, to ensure that residents, including Plaintiffs, were provided proper nutrition, as required by 42 U.S.C.A. § 1396r(b)(4)(A)(iv) and amplified by 42 C.F.R. § 483.25(g), as pled herein;

j.  By failing, as a custom and policy, to ensure that an ongoing program, directed by a qualified professional, of activities designed to meet the interests and the physical, mental and psychosocial well-being of each resident, including Plaintiffs, as required by 42 U.S.C.A. § 1396r(b)(4)(A)(v), as pled herein;

k.  By failing, as a custom and policy, to ensure that the personnel responsible for the care of residents, including Plaintiffs, were qualified to perform necessary services, as required by 42 U.S.C.A. § 1396r(b)(4)(B), as pled herein;

l.  By failing, as a custom and policy, to provide sufficient nursing staff to provide 24-hour nursing and related services sufficient to meet the nursing needs of the residents, including Plaintiffs, as required by 42 U.S.C.A. § 1396r(b)(4)(C), as pled herein;

m.  By failing, as a custom and policy, to maintain clinical records on all residents, including Plaintiffs, including, but not limited to the plans of care and resident's assessment, as required by 42 U.S.C.A. § 1396r(b)(6)(C), as pled herein;

n.  By failing, as a custom and policy, to keep the residents, including Plaintiffs, fully informed about care and treatment and changes in care or treatment that may affect the residents' well-beings, as required by 42 U.S.C.A. § 1396r(c)(1)(A)(i), as pled herein.

o.  By failing, as a custom and policy, to protect and promote the rights of residents, including Plaintiffs, to be free from physical or chemical restraints imposed for the purpose of discipline or convenience and not required to treat the resident's medical symptoms, as required by 42 U.S.C.A. § 1396r(c)(1)(A)(ii), as pled herein;

p.      By failing, as a custom and policy, to ensure that the SEVC facility was administrated in a manner that enabled it to use its resources effectively and efficiently to allow residents, including Plaintiffs, to maintain or attain their highest practicable level of physical, mental and psychosocial well-being as required by 42 U.S.C.A. § 1396r(d)(1)(A), as pled herein; and,

q.      By failing, as a custom and policy, to ensure that the SEVC was complying with federal, state, local laws, and accepted professional standards which apply to professionals providing services to residents, including Plaintiffs, and in operating such a facility as SEVC, as required by 42 U.S.C.A. § 1396r(d)(4)(A), as pled herein.

197.    Further evidence of the systematic violations of these rights, and that the violations of these rights were part of a "custom and policy" as evidenced by the inspection report prepared by the DOH as a result of inspections of the facility. The DOH records are attached and incorporated by reference as Exhibit 1 to this Complaint. *See* Ex. 1.

198.    The DOH records clearly establish that the violations of these rights were not limited to singular and isolated incidents, but rather were part of a much broader and more consistent "custom and policy" of Defendant Blackwood to violate residents' rights.

199.    Specifically, the DOH found that 128 of 154 residents were in immediate jeopardy. This widespread endangerment goes to the gravity of Defendant Blackwood's systemic failures to maintain a safe facility for SEVC's residents.

200.    This custom and policy include a DOH record indicating that, after an investigation which occurred on June 9, 2020, there was a citation issued to Defendant in regard to the care given to Plaintiffs, when the facility failed to, among other things, properly implement the CMS and CDC recommended practices for COVID-19 and failed to prevent the potential for cross-

contamination of infection, specifically leading to the death of more than 42 skilled nursing residents, including Plaintiffs.

201.    As a proximate result of Defendant Blackwood's actionable derogation of his regulatory and statutory responsibilities as above-described, Plaintiffs were injured as previously referenced, and suffering pain, distress and death (as it related to Plaintiffs Mottola and Murphy) as a result of the poor care, treatment, and management, which exposed them to COVID-19, as described herein. As such, Plaintiffs suffered, and are entitled to recover the following damages, as well as an award of reasonable counsel fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988:

      a.      Pain, suffering, inconvenience, anxiety and nervousness of Plaintiffs;

      b.      Hospital, medical, surgical and nursing expenses incurred; and,

      c.      Other losses and damages permitted by law.

WHEREFORE, Plaintiffs Lawrence Mottola, Individually and as Executor of the Estate of Anthony Mottola, Deceased; William R. Murphy, III, Individually and as Administrator of the Estate of William R. Murphy, Jr., Deceased; and Lisa Krause, as Attorney-in-Fact of John Trowbridge, claim damages against Defendant Rohan Blackwood individually and demand compensatory and punitive damages from the Defendant in an amount in excess of the jurisdictional arbitration limits, together with interest, and any other relief this Honorable Court deems appropriate.

## COUNT IV:
## DEPRAVATION OF CIVIL RIGHTS PROTECTED UNDER FEDERAL NURSING HOME REFORM ACT ("FNHRA")

### (All Plaintiffs vs. Deborah Mullane)

202. The averments of the previous paragraphs are incorporated by reference as if fully set forth.

203. Defendant Mullane was an agent of the Commonwealth of Pennsylvania via her position as DON of SEVC, a facility operated by the Department of Veterans Affairs. Accordingly, at all times material hereto, Defendant Mullane was acting under color of state law.

204. Defendant Mullane is bound generally by the 1987 Omnibus Budget Reconciliation Act ("OBRA") and the Federal Nursing Home Reform Act ("FNHRA"), which is contained within the 1987 OBRA. *See:* 42 U.S.C. § 1396r; 42 U.S.C. § 1396a(w) (as incorporated by 42 U.S.C. § 1396(r).) Defendant Blackwood is also bound generally by the OBRA/FNHRA implementing regulations found at 42 C.F.R. § 483, *et seq.*, which served to define specific statutory rights set forth in the above-mentioned statutes.

205. The specific detailed regulatory provisions as well as the statutes in question create rights for Plaintiffs, which are enforceable pursuant to 42 U.S.C. § 1983, as the language of these regulations and statutory provisions clearly and unambiguously creates those rights.

206. Defendant Mullane, in derogation of the above statute and regulations, and as a custom and policy, failed to comply with the aforementioned regulations as follows:

    a.    By failing, as a custom and policy, to ensure that residents, including Plaintiffs, did not suffer verbal, physical and mental abuse as required by 42 U.S.C.A. § 1396r(c)(1)(A)(ii) and amplified by 42 C.F.R. § 483.13(b), as pled herein;

    b.    By failing, as a custom and policy, to care for residents, including Plaintiffs, in a manner that promoted maintenance or enhancement of their lives, as required by 42 U.S.C.A. § 1396r(b)(1)(A), as pled herein;

    c.    By failing, as a custom and policy, to develop a comprehensive plan of care for residents, including Plaintiffs, to meet the residents' medical, nursing, and

psychosocial needs, as required by 42 U.S.C.A. § 1396r(b)(2)(A) and amplified by 42 C.F.R. §483.20(b), as pled herein;

d.       By failing, as a custom and policy, to provide residents, including Plaintiffs, the necessary care and services to allow them to attain or maintain the highest, practicable, physical, mental and psychosocial well-being, as required 42 U.S.C.A. § 1396r(b)(2) and amplified by 42 C.F.R. § 483.25, as pled herein;

e.       By failing, as a custom and policy, to periodically review and revise resident's written plan of care by an interdisciplinary team after each of the resident's assessments, as described within 42 U.S.C.A. §1396r(b)(3)(A) and as required by 42 U.S.C.A. § 1396r(b)(2)(C), as pled herein;

f.       By failing, as a custom and policy, to conduct an assessment of residents, such as Plaintiffs, promptly after a significant change in the resident's physical or mental condition occurs, as required by 42 U.S.C.A. §1396r(b)(3)(A) and 42 U.S.C.A. §1396r(b)(3)(C)(i)(II), as pled herein;

g.       By failing, as a custom and policy, to use the results of the assessments required and as described above in developing, reviewing and revising the residents' plan of care, such as Plaintiffs, as required by 42 U.S.C.A. § 1396r(b)(3)(D), as pled herein;

h.       By failing, as a custom and policy, to ensure that residents, including Plaintiffs, were provided medically-related social services to attain or maintain the highest practicable physical, mental and psychosocial well-being, as required by 42 U.S.C.A. § 1396r(b)(4)(ii), as pled herein;

i.       By failing, as a custom and policy, to ensure that residents, including Plaintiffs, were provided proper nutrition, as required by 42 U.S.C.A. § 1396r(b)(4)(A)(iv) and amplified by 42 C.F.R. § 483.25(g), as pled herein;

j.       By failing, as a custom and policy, to ensure that an ongoing program, directed by a qualified professional, of activities designed to meet the interests and the physical, mental and psychosocial well-being of each resident, including Plaintiffs, as required by 42 U.S.C.A. § 1396r(b)(4)(A)(v), as pled herein;

k.     By failing, as a custom and policy, to ensure that the personnel responsible for the care of residents, including Plaintiffs, were qualified to perform necessary services, as required by 42 U.S.C.A. § 1396r(b)(4)(B), as pled herein;

l.     By failing, as a custom and policy, to provide sufficient nursing staff to provide 24-hour nursing and related services sufficient to meet the nursing needs of the residents, including Plaintiffs, as required by 42 U.S.C.A. § 1396r(b)(4)(C), as pled herein;

m.     By failing, as a custom and policy, to maintain clinical records on all residents, including Plaintiffs, including, but not limited to the plans of care and resident's assessment, as required by 42 U.S.C.A. § 1396r(b)(6)(C), as pled herein;

n.     By failing, as a custom and policy, to keep the residents, including Plaintiffs, fully informed about care and treatment and changes in care or treatment that may affect the residents' well-beings, as required by 42 U.S.C.A. § 1396r(c)(1)(A)(i), as pled herein;

o.     By failing, as a custom and policy, to protect and promote the rights of residents, including Plaintiffs, to be free from physical or chemical restraints imposed for the purpose of discipline or convenience and not required to treat the resident's medical symptoms, as required by 42 U.S.C.A. § 1396r(c)(1)(A)(ii), as pled herein;

p.     By failing, as a custom and policy, to ensure that the SEVC facility was administrated in a manner that enabled it to use its resources effectively and efficiently to allow residents, including Plaintiffs, to maintain or attain their highest practicable level of physical, mental and psychosocial well-being as required by 42 U.S.C.A. § 1396r(d)(1)(A), as pled herein; and,

q.     By failing, as a custom and policy, to ensure that the SEVC was complying with federal, state, local laws, and accepted professional standards which apply to professionals providing services to residents, including Plaintiffs, and in operating such a facility as SEVC, as required by 42 U.S.C.A. § 1396r(d)(4)(A), as pled herein.

207.   Further evidence of the systematic violations of these rights, and that the violations of these rights were part of a "custom and policy" as evidenced by the inspection report prepared by the DOH as a result of inspections at the facility. The DOH records are attached and incorporated by reference as Exhibit 1 to this Complaint. *See* Ex. 1.

208.   The DOH records clearly establish that the violations of these rights were not limited to singular and isolated incidents, but rather were part of a much broader and more consistent "custom and policy" of Defendant Mullane to violate residents' rights.

209.   Specifically, the DOH found that 128 of 154 residents were in immediate jeopardy. This widespread endangerment goes to the gravity of Defendant Mullane's systemic failures to maintain a safe facility for SEVC's residents.

210.   This custom and policy includes a DOH record indicating that, after an investigation which occurred on June 9, 2020, there was a citation issued to Defendant in regards to the care given to Plaintiffs, when the facility failed to, among other things, properly implement the CMS and CDC recommended practices for COVID-19 and failed to prevent the potential for cross-contamination of infection, specifically leading to the death of more than 42 skilled nursing residents, including Plaintiffs, as pled herein.

211.   As a proximate result of Defendant Mullane's actionable derogation of her regulatory and statutory responsibilities as above-described, Plaintiffs were injured as previously referenced, and suffering pain, distress and death (as it related to Plaintiffs Mottola and Murphy) as a result of the poor care, treatment, and management, which exposed them to COVID-19, as described herein. As such, Plaintiffs suffered, and are entitled to recover the following damages, as well as an award of reasonable counsel fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988:

      a.   Pain, suffering, inconvenience, anxiety and nervousness;

      b.        Hospital, medical, surgical and nursing expenses incurred; and,

      c.        Other losses and damages permitted by law.

WHEREFORE, Plaintiffs Lawrence Mottola, Individually and as Executor of the Estate of Anthony Mottola, Deceased; William R. Murphy, III, Individually and as Administrator of the Estate of William R. Murphy, Jr., Deceased; and Lisa Krause, as Attorney-in-Fact of John Trowbridge, claim damages against Defendant Mullane individually and demand compensatory and punitive damages from the Defendant in an amount in excess of the jurisdictional arbitration limits, together with interest, and any other relief this Honorable Court deems appropriate.

## COUNT V:
## NEGLIGENCE
**(All Plaintiffs vs. Rohan Blackwood)**

212.    The averments of the previous paragraphs are incorporated by reference as if fully set forth.

213.    At all relevant times, Defendant Blackwood acted within the course and scope of his employment as Commandant at SEVC.

214.    Defendant Blackwood is a "Commonwealth party" as described in 42 Pa. C.S.A. § 8522 who oversaw and provided medical care to SEVC residents; therefore, Defendant Blackwood is liable to Plaintiffs for damages under the medical-professional liability exception to sovereign immunity.

215.    Defendant Blackwood had a duty to act prudently and had a duty to provide reasonable and ordinary care and services Plaintiffs and all other SEVC residents.

216.    Defendant Blackwood had a duty to oversee all persons who practice medicine within SEVC's facility.

217.    Defendant Blackwood had a duty to formulate, adopt, and enforce adequate rules and policies to ensure quality care for residents such as Plaintiffs.

218.    Defendant Blackwood negligently, recklessly, carelessly, and wantonly breached the duties owed to Plaintiffs in the following ways:

a.    By inadequately and improperly training and educating to caregiving staff on infection prevention and control, as pled herein;

b.    By inadequately and improperly ensuring all caregiving staff members attended and were properly trained on infection prevention and control, and by inadequately ensuring all staff were properly re-educated as required; as pled herein;

c.    By disseminating untrue information and/or withholding some or all relevant information from residents and their families about the spread of COVID-19 within SEVC, so as to prevent them from making informed decisions for the wellbeing of their loved ones in SEVC, as pled herein;

d.    By inadequately and improperly enforcing safe social distancing among staff and residents, as pled herein;

e.    By inadequately and improperly and improperly storing linens and soiled laundry, as pled herein;

f.    By inadequately and improperly ensuring all employees properly wore gloves and performed hand hygiene, as pled herein;

g.    By inadequately and improperly ensuring all employees knew of and properly followed guidelines for sanitizing medical equipment in between uses on different residents, as pled herein.

h.    By inadequately and improperly ensuring all employees properly used PPE and were trained on proper use of PPE, as pled herein;

i.    By inadequately and improperly ensuring all residents properly used PPE and were instructed on the proper use of PPE, as pled herein;

j.     By inadequately and improperly quarantining sick residents and residents who were exposed to other residents who were experiencing symptoms of COVID-19, as pled herein;

k.     By preventing residents and staff from receiving testing for COVID-19 for a period of several months, as pled herein;

l.     By preventing sick residents from being transferred to the hospital, as pled herein;

m.    By implementing a policy that considered all residents and staff were "presumed positive" whether or not they were experiencing symptoms, as pled herein;

n.     By lying to the families regarding the status of the virus within the facility, as pled herein;

o.     By preventing staff from speaking freely to the families and/or media about the status of COVID-19 within the facility and threatening staff about termination if staff spoke freely; and,

p.     By lying to the residents' families regarding the condition of their loved ones, as pled herein.

219.    At all relevant times, Rohan Blackwood, as Commandant at SEVC, had a duty to not violate the legal rights of any resident and to comply with all provisions of Title 28, Pa. Administrative Code, Chapters 201 (General Operation of Long-Term Care Nursing Facilities) and 211 (Program Standards for Long-Term Care Nursing Facilities) and 42 C.F.R. §483 *et seq.* (Centers for Medicare & Medicaid Services, Department of Health and Human Services Requirements for Long Term Care Facilities).

220.    These state and federal regulations comprise part of the standard of care that facilities like SEVC must provide to its residents.

221.    These state and federal regulations are designed and intended to protect the interests of skilled nursing and long-term care residents such as the Plaintiffs.

222.    These state and federal regulations are designed and intended to protect the interests of skilled nursing and long-term care residents against the hazards the Plaintiffs encountered at SEVC and the type of harm they suffered – specifically, contracting viral infections from other residents and/or staff and ultimately dying from the virus.

223.    Defendant Blackwood negligently, recklessly, carelessly, and wantonly violated these state and federal regulations in the following ways:

    a.    By inadequately assessing the appropriateness of the medical services provided to SEVC's residents, as required by 28 Pa. Code § 211.2(c), as pled herein;

    b.    By inadequately and improperly reviewing incidents occurring in SEVC and addressing the health and safety hazards of the facility, as required by 28 Pa. Code § 211.2(d)(1), as pled herein;

    c.    By withholding appropriate information from SEVC's Administrator, and/or DON, in order to ensure a safe and sanitary environment for residents and personnel, as required by 28 Pa. Code § 211.2(d)(1), as pled herein;

    d.    By improperly implementing resident care policies, as required by 42 C.F.R. 483.70(h), as pled herein; and,

    e.    By inadequately and improperly coordinating medical care in SEVC, as required by 42 C.F.R. § 483.70(h), as pled herein.

224.    As a direct and proximate result of the negligent, reckless, careless, and wanton actions and inactions of Defendant Blackwood, as set forth above, the Plaintiffs suffered the following damages:

    a.    The Plaintiffs experienced pain, suffering, infirmity, deterioration, debilitation, loss of enjoyment of life, anxiety, and isolation/confinement from contracting and being treated for the COVID-19; and,

    b.    The Plaintiffs incurred hospital, medical, and nursing expenses to be treated for the COVID-19 virus and its sequelae and effects.

225.    Furthermore, because the negligence of Defendant Blackwood went beyond ordinary negligence into gross negligence, recklessness, and wanton conduct, Plaintiffs are entitled to recover punitive damages.

226.    Defendant DMVA as owner and operator of SEVC is vicariously liable for the acts and omissions of Defendant Blackwood, as set forth in this Count, and are therefore jointly and severally liable for the damages claimed herein.

WHEREFORE, Plaintiffs Lawrence Mottola, Individually and as Executor of the Estate of Anthony Mottola, Deceased; William R. Murphy, III, Individually and as Administrator of the Estate of William R. Murphy, Jr., Deceased; and Lisa Krause, as Attorney-in-Fact of John Trowbridge, claim damages against Defendant Rohan Blackwood and demand compensatory and punitive damages from the Defendant in an amount in excess of the jurisdictional arbitration limits, together with interest, and any other relief this Honorable Court deems appropriate.

**COUNT VI:**
**NEGLIGENCE**
**(All Plaintiffs vs. Deborah Mullane)**

227.    The averments of the previous paragraphs are incorporated by reference as if fully set forth.

228.    At all relevant times, Defendant Mullane acted within the course and scope of her employment as the DON at SEVC.

229.    Defendant Mullane is a "Commonwealth party" as described in 42 Pa. C.S.A. § 8522 who oversaw and provided medical care to SEVC residents; therefore, Defendant Mullane is liable to Plaintiffs for damages under the medical-professional liability exception to sovereign immunity.

230.     Defendant Mullane had a duty to act prudently and had a duty to provide reasonable and ordinary care and services Plaintiffs and all other SEVC residents.

231.     Defendant Mullane had a duty to ensure that all persons providing care within SEVC were competent to provide such care.

232.     Defendant Mullane negligently, recklessly, carelessly, and wantonly breached the duties owed to Plaintiffs in the following ways:

a.     By inadequately and improperly training and educating to caregiving staff on infection prevention and control, as pled herein;

b.     By inadequately and improperly ensuring all caregiving staff members attended and were properly trained on infection prevention and control, and by inadequately ensuring all staff were properly re-educated as required; as pled herein;

c.     By disseminating untrue information and/or withholding some or all relevant information from residents and their families about the spread of COVID-19 within SEVC, so as to prevent them from making informed decisions for the wellbeing of their loved ones in SEVC, as pled herein;

d.     By inadequately and improperly enforcing safe social distancing among staff and residents, as pled herein;

e.     By inadequately and improperly and improperly storing linens and soiled laundry, as pled herein;

f.     By inadequately and improperly ensuring all employees properly wore gloves and performed hand hygiene, as pled herein;

g.     By inadequately and improperly ensuring all employees knew of and properly followed guidelines for sanitizing medical equipment in between uses on different residents, as pled herein.

h.     By inadequately and improperly ensuring all employees properly used PPE and were trained on proper use of PPE, as pled herein;

i.  By inadequately and improperly ensuring all residents properly used PPE and were instructed on the proper use of PPE, as pled herein;

j.  By inadequately and improperly quarantining sick residents and residents who were exposed to other residents who were experiencing symptoms of COVID-19, as pled herein;

k.  By preventing residents and staff from receiving testing for COVID-19 for a period of several months, as pled herein;

l.  By preventing sick residents from being transferred to the hospital, as pled herein;

m.  By implementing a policy that considered all residents and staff were "presumed positive" whether or not they were experiencing symptoms, as pled herein;

n.  By lying to the families regarding the status of the virus within the facility, as pled herein;

o.  By preventing staff from speaking freely to the families and/or media about the status of COVID-19 within the facility and threatening staff about termination if staff spoke freely; and,

p.  By lying to the residents' families regarding the condition of their loved ones, as pled herein.

233.   At all relevant times, Defendant Mullane, as DON at SEVC, had a duty to not violate the legal rights of any resident and to comply with all provisions of Title 28, Pa. Administrative Code, Chapters 201 (General Operation of Long-Term Care Nursing Facilities) and 211 (Program Standards for Long-Term Care Nursing Facilities) and 42 C.F.R. §483 *et seq.* (Centers for Medicare & Medicaid Services, Department of Health and Human Services Requirements for Long Term Care Facilities).

234.   These state and federal regulations comprise part of the standard of care that facilities like SEVC must provide to its residents.

235.    These state and federal regulations are designed and intended to protect the interests of skilled nursing and long-term care residents such as the Plaintiffs.

236.    These state and federal regulations are designed and intended to protect the interests of skilled nursing and long-term care residents against the hazards the Plaintiffs encountered at SEVC and the type of harm they suffered – specifically, contracting viral infections from other residents and/or staff and ultimately dying from the virus.

237.    Defendant Mullane negligently, recklessly, carelessly, and wantonly violated these state and federal regulations in the following ways:

    a.    By inadequately assessing the appropriateness of the medical services provided to SEVC's residents, as required by 28 Pa. Code § 211.2(c), as pled herein;

    b.    By inadequately and improperly reviewing incidents occurring in SEVC and address the health and safety hazards of the facility, as required by 28 Pa. Code § 211.2(d)(1), as pled herein;

    c.    By withholding appropriate information to SEVC Administrators in order to ensure a safe and sanitary environment for residents and personnel, as required by 28 Pa. Code § 211.2(d)(1), as pled herein;

    d.    By improperly implementing resident care policies, as required by 42 C.F.R. 483.70(h), as pled herein; and,

    e.    By inadequately and improperly coordinating medical care in SEVC, as required by 42 C.F.R. § 483.70(h), as pled herein.

238.    As a direct and proximate result of the negligent, reckless, careless, and wanton actions and inactions of Defendant Mullane, as set forth above, the Plaintiffs suffered the following damages:

    a.    The Plaintiffs experienced pain, suffering, infirmity, deterioration, debilitation, loss of enjoyment of life, anxiety, and isolation/confinement from contracting and being treated for the COVID-19; and,

      b.     The Plaintiffs incurred hospital, medical, and nursing expenses to be treated for the COVID-19 virus and its sequelae and effects.

239. Furthermore, because the negligence of Defendant Mullane went beyond ordinary negligence into gross negligence, recklessness, and wanton conduct, Plaintiffs are entitled to recover punitive damages.

240. Defendant DMVA as owner and operator of SEVC is vicariously liable for the acts and omissions of Defendant Mullane, as set forth in this Count, and are therefore jointly and severally liable for the damages claimed herein.

WHEREFORE, Plaintiffs Lawrence Mottola, Individually and as Executor of the Estate of Anthony Mottola, Deceased; William R. Murphy, III, Individually and as Administrator of the Estate of William R. Murphy, Jr., Deceased; and Lisa Krause as Attorney-in-Fact of John Trowbridge, claim damages against Defendant Deborah Mullane and demand compensatory and punitive damages from the Defendant in an amount in excess of the jurisdictional arbitration limits, together with interest, and any other relief this Honorable Court deems appropriate.

### COUNT VII:
### <u>NEGLIGENCE: VICARIOUS LIABILITY</u>
### (All Plaintiffs vs. SEVC)

241. The averments of the previous paragraphs are incorporated by reference as if fully set forth.

242. SEVC is a "Commonwealth party" as described in 42 Pa. C.S.A. § 8522 which provides medical care to the residents within its facility; therefore, SEVC is liable to Plaintiffs for damages under the medical-professional liability exception to sovereign immunity.

243. SEVC employs individuals who work in a solely managerial and supervisory capacity, and who do not provide hands-on care to residents. These managerial and supervisory

health care personnel include (but are not limited to) positions such as the Commandant, Administrator, Assistant Administrator, Director of Nursing, and Assistant Director of Nursing.

244.    At all relevant times, the acts committed by SEVC's managerial and supervisory agents, servants, and/or health care personnel constitute "[a]cts of health care employees of Commonwealth party who is a doctor, dentist, nurse or related health care personnel…" as described in the medical-professional liability exception to sovereign immunity pursuant to 42 Pa. C.S.A. § 8522(b)(2).

245.    At all relevant times, SEVC acted by and through these managerial and supervisory agents, servants, and/or health care personnel, who were then and there acting within the course and scope of their employment. Accordingly, SEVC is vicariously liable for any negligence of these managerial and supervisory agents, servants, and/or employees.

246.    This cause of action is limited to SEVC's vicarious liability for the negligence of only these managerial/supervisory health care personnel who did not provide hands-on care to residents—such as the Commandant, Administrator, Assistant Administrator, Director of Nursing, and the Assistant Director of Nursing. Plaintiffs do not seek to hold SEVC vicariously liable for the actions or inactions of SEVC's front-line caregiving nursing staff, whose members did the best they could to provide care in the dangerous atmosphere created by SEVC and SEVC's management.

247.    SEVC, by and through its supervisory and administrative health care personnel, specifically including the Commandant, Administrator, Assistant Administrator, Director of Nursing, and the Assistant Director of Nursing, had a duty to provide appropriate health care and health care services to residents in a reasonable manner and in accordance with appropriate standards of care.

54

248.    SEVC, by and through its managerial and supervisory health care personnel negligently, recklessly, carelessly, and wantonly breached their duties owed to the Plaintiffs in the following ways:

    a.    By inadequately establishing and maintaining an infection prevention and control program ("IPCP") that provided a safe, sanitary and comfortable environment which prevented the development and transmission of communicable diseases and infections, namely the transmission of COVID-19, as pled herein;

    b.    By inadequately establishing written standards, policies, and procedures for the above-mentioned IPCP, which should have specified a system of surveillance designed to identify possible communicable diseases before they can spread to other persons in the facility, to whom and when possible incidents of communicable disease or infections should be reported, precautions to be followed to prevent the spread of infections, when and how isolation should be used for a resident, and circumstances under which the facility must prohibit and prevent employees with communicable disease or infections from having direct contact with residents, as pled herein, as pled herein;

    c.    By inadequately training and educating caregiving staff on infection prevention and control, as pled herein, as pled herein;

    d.    By inadequately and improperly ensuring all caregiving staff members attended and were properly trained on infection prevention and control, and by failing to ensure all staff were properly re-educated as required; as pled herein, as pled herein;

    e.    By inadequately communicating truthful information to residents and their families about the spread of COVID-19 within the SEVC facility, so as to allow them to make informed decisions for the wellbeing of their loved ones in the SEVC facility, as pled herein;

    f.    By inadequately establishing and enforcing social distancing procedures to staff and residents, as pled herein;

g.     By improperly storing clean linens and soiled laundry, as pled herein;

h.     By inadequately enforcing the use of gloves and proper hand hygiene, as pled herein;

i.     By inadequately ensuring all employees properly used PPE and were trained on proper use of PPE, as pled herein;

j.     By inadequately ensuring all residents properly used PPE and were instructed on the proper use of PPE, as pled herein;

k.     By inadequately ensuring all employees knew of and properly followed guidelines for sanitizing medical equipment in between uses on different residents, as pled herein;

l.     By systemically and intentionally understaffing the facility, as pled herein;

m.     By housing sick residents and residents who were exposed to other residents who were experiencing symptoms with residents who were not sick, as pled herein;

n.     By exposing healthy residents to sick residents experiencing symptoms of COVID-19, as pled herein;

o.     By refusing to test any resident or staff for several months, as pled herein;

p.     By forcing the residents, including residents experiencing symptoms of COVID-19 and residents who were not experiencing symptoms of COVID-19 to eat in the same lunchroom for several months, as pled herein;

q.     By implementing a policy that considered all residents and staff as "presumed positive" whether or not they were experiencing symptoms of COVID-19, as pled herein;

r.     By lying to residents' families regarding the status of the virus within the facility, as pled herein;

s.     By lying to the residents' families regarding the condition of their loved ones, as pled herein; and,

> t.   By refusing to transfer sick residents to the hospital promptly, as pled herein.

249.   At all relevant times, SEVC's managerial and supervisory personnel had a duty to not violate the legal rights of any resident and to comply with all provisions of Title 28, Pa. Administrative Code, Chapters 201 (General Operation of Long-Term Care Nursing Facilities) and 211 (Program Standards for Long-Term Care Nursing Facilities) and 42 C.F.R. §483 *et seq.* (Centers for Medicare & Medicaid Services, Department of Health and Human Services Requirements for Long Term Care Facilities).

250.   These state and federal regulations comprise part of the standard of care that facilities like SEVC must provide to its residents.

251.   These state and federal regulations are designed and intended to protect the interests of skilled nursing and long-term care residents such as the Plaintiffs.

252.   These state and federal regulations are designed and intended to protect the interests of skilled nursing and long-term care residents against the hazards the Plaintiffs encountered at SEVC and the type of harm they suffered – specifically, contracting viral infections from other residents and/or staff and dying from the virus.

253.   SEVC's managerial and supervisory health care personnel negligently, recklessly, carelessly, and wantonly violated these state and federal regulations in the following ways:

> a.   By improperly and inadequately enforcing regulations relative to the level of health care and safety of residents, as required by 28 Pa. Code § 201.18(e)(1), as pled herein;

> b.   By improperly and inadequately developing and enforcing adherence to policies and procedures to protect residents' rights, as required by 28 Pa. Code § 201.29(a), as pled herein;

c.      By improperly and inadequately training staff in proper implementation of policies and procedures, as required by 28 Pa. Code § 201.29(d), as pled herein;

d.      By improperly and inadequately treating Plaintiffs with consideration, respect, and full recognition of dignity and individuality, as required by 28 Pa. Code § 201.29(j), as pled herein;

e.      By improperly and inadequately reporting to the appropriate health agencies and appropriate Division of Nursing Care Facilities field office when a resident developed a reportable disease, as required by 28 Pa. Code § 211.1(a), as pled herein;

f.      By improperly and inadequately designing and implementing resident care policies to ensure the Plaintiffs' total medical needs were met and that they were protected from infection, as required by 28 Pa. Code § 211.10(d), as pled herein;

g.      By improperly and inadequately updating the facility's resident care policies as necessary to meet the total medical and psychosocial needs of SEVC's residents, as required by 28 Pa. Code §211.10, as pled herein;

h.      By the Director of Nursing's inadequacies in maintaining standards of accepted nursing practice, as required by 28 Pa. Code §211.12(d)(1), as pled herein;

i.      By the Director of Nursing's inadequacies in ensuring that the facility maintained proper nursing policy and procedure manuals, as required by 28 Pa. Code §211.12(d)(2), as pled herein;

j.      By the Director of Nursing's inadequacies in ensuring that the facility maintained proper methods for coordination of nursing services with other resident services, as required by 28 Pa. Code §211.12(d)(3), as pled herein;

k.      By the Director of Nursing's inadequacies in making proper recommendations for the number and levels of nursing personnel to be employed, as required by 28 Pa. Code §211.12(d)(4), as pled herein;

l.      By the Director of Nursing's inadequacies in providing adequate general supervision, guidance, and assistance in the implementation of residents' personal health programs to assure that preventative measures, treatments, and other health services were properly carried out, as required by 28 Pa. Code §211.12(d)(5), as pled herein;

m.      By improperly and inadequately protecting and promoting Plaintiffs' rights as residents, as required by 42 C.F.R. § 483.10, as pled herein;

n.      By improperly and inadequately ensuring that every resident, including Plaintiffs and their representatives, could exercise his or her rights without interference, coercion, discrimination, or reprisal from the facility, as required by 42 C.F.R. § 483.10(b)(1), as pled herein;

o.      By improperly and inadequately treating each resident with respect and dignity and care in a manner and in an environment that promotes maintenance or enhancement of his or her quality of life, as required by 42 C.F.R. § 483.10(a)(1), as pled herein;

p.      By improperly and inadequately ensuring all residents, including Plaintiffs, received the necessary care and services to attain or maintain the highest practicable qualify of life, including physical, mental, and psychosocial well-being, as required by 42 C.F.R. § 483.24, as pled herein;

q.      By improperly and inadequately ensuring all residents, including Plaintiffs, received treatment and care in accordance with professional standards of practice, as required by 42 C.F.R. § 483.25, as pled herein;

r.      By improperly and inadequately maintaining an emergency preparedness plan that meets the minimum requirements, as set forth by 42 C.F.R. § 483.73, as pled herein;

s.   By improperly and inadequately maintaining an infection prevention and control program designed to provide a safe, sanitary, and comfortable environment and to help prevent the development and transmission of communicable diseases and infection, as required 42 C.F.R. § 483.80, as pled herein;

t.   By improperly and inadequately establishing a system for preventing, identifying, reporting, investigating, and controlling infections and communicable diseases for all residents, staff, volunteers, visitors, as required by 42 C.F.R. § 483.80(a)(1), as pled herein;

u.   By improperly and inadequately establishing a system of surveillance designed to identify possible communicable diseases or infections before they can spread to other persons in the facility, as required by 42 C.F.R. § 483.80(a)(2)(i), as pled herein;

v.   By improperly and inadequately establishing a system that specified standard and transmission-based precautions to be followed to prevent spread of infections, as required by 42 C.F.R. § 483.80(a)(2)(iii), as pled herein;

w.   By improperly and inadequately establishing a system that specified when and how isolation should be used for a resident, including the type and duration of the isolation, as required by 42 C.F.R. § 483.80(a)(2)(iv), as pled herein;

x.   By improperly and inadequately establishing a system that specified the circumstances under which the facility must prohibit employees with a communicable disease from direct contact with residents, if direct contract will transmit the disease, as required by 42 C.F.R. § 483.80(a)(2)(v), as pled herein; and,

y.   By the designated Infection Preventionist(s)' inadequacies of administering the facility's IPCP in accordance with the requirements of 42 C.F.R. § 483.80, as pled herein.

254.   As a direct and proximate result of the negligent, reckless, careless, and wanton acts and omissions of SEVC's managerial and supervisory health care personnel, as set forth

above, SEVC's caregiving staff was unable to contain and control the spread of COVID within SEVC's walls.

255.    As a direct and proximate result of the negligent, reckless, careless, and wanton acts and omissions of SEVC's managerial and supervisory health care personnel, as set forth above, the Plaintiffs were exposed to and contracted COVID-19.

256.    As a direct and proximate result of the negligent, reckless, careless, and wanton acts and omissions of SEVC's managerial and supervisory health care personnel, as set forth above, the Plaintiffs suffered the following damages:

      a.    The Plaintiffs experienced pain, suffering, infirmity, deterioration, debilitation, loss of enjoyment of life, anxiety, and isolation/confinement from contracting and being treated for the COVID-19; and,

      b.    The Plaintiffs incurred hospital, medical, and nursing expenses to be treated for the COVID-19 virus and its sequelae and effects.

257.    Furthermore, because the negligence of SEVC's managerial and supervisory health care personnel went beyond ordinary negligence into gross negligence, recklessness, and wanton conduct, Plaintiffs are entitled to recover punitive damages.

WHEREFORE, Plaintiffs Lawrence Mottola, Individually and as Executor of the Estate of Anthony Mottola, Deceased; William R. Murphy, III, Individually and as Administrator of the Estate of William R. Murphy, Jr., Deceased; and Lisa Krause, as Attorney-in-Fact of John Trowbridge claim damages against Defendant Department of Military and Veterans Affairs, as owner and operator of Southeastern Veterans' Center, and demand compensatory damages from the Defendant in an amount in excess of the jurisdictional arbitration limits, together with interest, and any other relief this Honorable Court deems appropriate.

## COUNT VIII:
## CORPORATE NEGLIGENCE
### (All Plaintiffs vs. SEVC)

258.    The averments of the previous paragraphs are incorporated by reference as if fully set forth.

259.    SEVC is a "Commonwealth party" as described in 42 Pa. C.S.A. § 8522 which provides medical care to the residents within its facility; therefore, SEVC is directly liable to Plaintiffs for damages under the medical-professional liability exception to sovereign immunity.[30]

260.    SEVC exercised complete control over all aspects of the operation and management of SEVC prior to and during the COVID outbreak at SEVC, including, but not limited to hiring and training caregiving staff; monitoring resident acuity levels and staffing sufficiently to meet each resident's needs; admitting and discharging residents to and from the facility; and creating and enforcing written policies and procedures to provide for the safety and well-being of all residents.

261.    Each of these managerial and operational functions had a direct impact on the quality of care provided to the Plaintiffs and other residents in SEVC.

262.    SEVC had a duty to act prudently and had a duty to provide reasonable and ordinary care and care services to the Plaintiffs.

---

[30] Plaintiffs plead this cause of action with the understanding that so-called "corporate negligence" claims against Commonwealth parties are not currently considered within the "medical professional" liability exception. *See e.g. Moser v. Heistand,* 681 A.2d 1322, 1326 (Pa. 1996); *Byrne v. Dept. of Military and Veterans Affairs,* 2019 WL 1284539, *3 (Pa. Cmwlth 2019); *Cornish v. City of Philadelphia,* 2015 WL 4931758 *7 (E.D. Pa. 2015); *Lor v. Com.,* 2000 WL 186839 *4 (E.D. Pa. 2000). However, Plaintiffs plead this cause of action with the good faith belief that current caselaw incorrectly interprets the immunity statutes, and the Pennsylvania Supreme Court will determine as such. *See Moser v. Heistand,* 681 A.2d 1322, 1327 (Pa. 1996) (Nigro, J., dissenting).

263. SEVC had a duty to provide caregiving staff with sufficient personal protective equipment, sanitation and hygiene products, and medical tools to prevent cross-contamination and the spread of infection to residents, including Plaintiffs, and other staff.

264. SEVC had a duty to ensure that all persons providing care within the SEVC facility were competent to provide that care.

265. SEVC had a duty to oversee all medical care provided to its residents, including Plaintiffs.

266. SEVC had a duty to formulate, adopt, and enforce adequate rules and policies to ensure quality care for residents at SEVC, such as the Plaintiffs.

267. SEVC had a duty to ensure that SEVC was sufficiently staffed to meet the needs of its residents, including Plaintiffs.

268. SEVC had a duty to enforce its policies and procedures regarding infectious disease and cross-contamination.

269. Defendant SEVC negligently, recklessly, carelessly, and wantonly breached its duties owed to the Plaintiffs, Anthony Mottola, William R. Murphy, and John Trowbridge in the following particulars:

> a. By inadequately establishing and maintain an infection prevention and control program ("IPCP") that provided a safe, sanitary and comfortable environment which prevents the development and transmission of communicable diseases and infections, namely the transmission of COVID-19, as pled herein;
>
> b. By inadequately establishing written standards, policies, and procedures for above-mentioned IPCP, which should have specified a system of surveillance designed to identify possible communicable diseases before they can spread to other persons in the facility, to whom and when possible incidents of communicable disease or infections should be reported, precautions to be followed to prevent the spread of

infections, when and how isolation should be used for a resident, and circumstances under which the facility must employees with communicable disease or infections from having direct contact with residents, as pled herein;

c.      By inadequately providing staff training and education on infection prevention and control, which is required to occur at least annually as in-service training, as pled herein;

d.      By inadequately ensuring all staff attended and were properly trained on infection prevention and control and failing to ensure all staff were properly re-educated as required, as pled herein;

e.      By inadequately ensuring that the Commandant, Rohan Blackwood, and Director of Nursing, Deborah Mullane, were properly overseeing the facility in providing care to residents, as pled herein;

f.      By inadequately ensuring that the Commandant, Rohan Blackwood, and Director of Nursing, Deborah Mullane, were properly safeguarding that the quality of care provided met all applicable standards, as pled herein;

g.      By inadequately ensuring that the Commandant, Rohan Blackwood, and Director of Nursing, Deborah Mullane, were properly auditing infection control procedures, as required, as pled herein;

h.      By inadequately communicating and discussing important medical information to the families of residents, so as to allow them to make necessary medical decisions on behalf of their resident family members, as pled herein;

i.      By inadequately keeping families, outside medical professionals, the Pennsylvania Department of Health, and the general public up to date with the health situation inside the facility, as pled herein;

j.      By inadequately requesting assistance from the proper authorities when it became apparent that COVID-19 was spreading throughout the facility, as pled herein;

k.      By inadequately testing residents and staff for COVID-19 so as to properly separate positive individuals from those who had not been exposed to the virus, as pled herein;

l.     By creating an extreme risk of exposure and danger to residents by presuming the entire facility, all residents, and all staff were positive for COVID-19 when in fact they were not all infected, as pled herein;

m.     By inadequately establishing and enforcing social distancing procedures were maintained by staff, as pled herein;

n.     By improperly storing clean linens and soiled laundry, as pled herein;

o.     By inadequately providing proper supplies to perform handwashing, as pled herein;

p.     By inadequately ensuring sinks are accessible to perform handwashing, as pled herein;

q.     By inadequately and improperly storing biohazardous waste, as pled herein;

r.     By inadequately ensuring all employees properly wear gloves and perform hand hygiene, as pled herein;

s.     By inadequately ensuring all employees had access to and properly used PPE, as pled herein;

t.     By inadequately ensuring all employees knew of and properly followed sanitary guidelines for sanitizing medical equipment in between uses on different residents, as pled herein;

u.     By inadequately maintaining a clean and sanitary environment, the lack of which created the potential for cross-contamination and the spread of diseases and infections, as pled herein; and,

v.     By improperly recognizing and appreciating the extreme risk of the spread and cross-contamination of COVID-19 to residents, who due to age, pre-existing conditions, and living arrangements are already some of the most vulnerable in our communities.

270.    At all relevant times, SEVC had a duty to not violate the legal rights of any resident and to comply with all provisions of Title 28, Pa. Administrative Code, Chapters 201 (General Operation of Long-Term Care Nursing Facilities) and 211 (Program Standards for Long-Term Care Nursing Facilities) and 42 C.F.R. §483 *et seq.* (Centers for Medicare & Medicaid Services, Department of Health and Human Services Requirements for Long Term Care Facilities).

271.    These state and federal regulations comprise part of the standard of care that facilities like SEVC must provide to its residents, including Plaintiffs.

272.    These state and federal regulations are designed and intended to protect the interests of skilled nursing and long-term care residents, such as the Plaintiffs.

273.    These state and federal regulations are designed and intended to protect the interests of skilled nursing and long-term care residents against the hazards the Plaintiffs encountered at SEVC and the type of harm they suffered – specifically, contracting viral infections from other residents and/or staff , and, as it related to Plaintiffs Mottola and Murphy, ultimately dying from the virus.

274.    SEVC negligently, recklessly, and wantonly breached its duties owed to the Plaintiffs in the following ways:

a.    By improperly and inadequately electing an effective governing body to adopt and enforce rules for the health care and safety of the residents, as required by 28 Pa. Code § 201.18, as pled herein;

b.    By inadequately conducting ongoing coordinated educational programs for the development and improvement of skills of the facility's personnel, including training related to problems, needs, and rights of the residents, as required by 28 Pa. Code § 201.20(a), as pled herein;

c.    By inadequately conducting in-service training at least annually which includes infection prevention and control, as required by 28 Pa. Code §201.20(c), as pled herein;

d.    By admitting or re-admitting residents to SEVC with disease in the communicable stage when the facility did not have the capability to care for the needs of the resident, as prohibited by 28 Pa. Code §201.24(d), as pled herein;

e.    By inadequately and improperly training staff in the implementation of policies and procedures, as required by 28 Pa. Code § 201.29(d), as pled herein;

f.    By inadequately treating Plaintiffs with consideration, respect, and full recognition of dignity and individuality, as required by 28 Pa. Code § 201.29(j), as pled herein;

g.    By inadequately reporting to the appropriate health agencies and appropriate Division of Nursing Care Facilities filed office when a resident developed a reportable disease, as required by 28 Pa. Code § 211.1(a), as pled herein;

h.    By inadequately designing and implementing resident care policies to ensure the Plaintiffs' total medical needs were met and that they were protected from infection, as required by 28 Pa. Code § 211.10(d), as pled herein;

i.    By inadequately updating the facility's resident care policies as necessary to meet the total medical and psychosocial needs of SEVC's residents, as required by 28 Pa. Code §211.10, as pled herein;

j.    By inadequately providing services by a sufficient number of nursing personnel on a 24-hour basis to provide nursing care to meet the needs of all residents, as required by 28 Pa. Code § 211.12, as pled herein;

k.    By inadequately protecting and promoting Plaintiffs' resident rights, as required by 42 C.F.R. § 483.10, as pled herein;

l.    By inadequately treating each resident in a manner and in an environment that promoted maintenance or enhancement of his or her quality of life, as required by 42 C.F.R. § 483.10(a)(1), as pled herein;

m.    By inadequately and improperly notifying residents' representatives when there were significant changes in

67

residents' physical statuses, as required by 42 C.F.R. § 483.10(g)(14), as pled herein;

n.      By inadequately providing residents with a safe, clean, comfortable, and homelike environment, as required by 42 C.F.R. § 483.10(i), as pled herein;

o.      By inadequately providing housekeeping and maintenance services necessary to maintain a sanitary, orderly, and comfortable interior, as require by 42 C.F.R. § 483.10(i)(2), as pled herein;

p.      By discouraging residents from communicating with federal, state, or local officials, as prohibited by 42 C.F.R. § 483.10(k), as pled herein;

q.      By inadequately conducting a comprehensive assessment for the residents, including Plaintiffs, after significant changes in their condition, as required by 42 C.F.R. § 483.20, as pled herein;

r.      By inadequately ensuring all residents, including the Plaintiffs, received the necessary care and services to attain or maintain the highest practicable qualify of life, including physical, mental, and psychosocial well-being, as required by 42 C.F.R. § 483.24, as pled herein;

s.      By inadequately ensuring all residents, including Plaintiffs, received treatment and care in accordance with professional standards of practice, as required by 42 C.F.R. § 483.25, as pled herein;

t.      By inadequately providing sufficient nursing staff with the appropriate competencies and skill sets to provide nursing and related services to assure resident safety and attain or maintain the highest practicable physical, mental, and psychosocial well-being, as determined by resident assessments and individual plans of care and considering the number, acuity and diagnoses of the facility's resident population, as required by 42 C.F.R. § 483.35, as pled herein;

u.      By inadequately providing services by sufficient registered nurses on a 24-hour basis to provide nursing care to the plaintiff residents in accordance with their care plans, as required by 42 C.F.R. § 483.35(b), as pled herein;

v.    By inadequately obtaining diagnostic services to meet the needs of its residents, including Plaintiffs, as required by 42 C.F.R. § 483.50(b), as pled herein;

w.    By inadequately administering the SEVC facility in such a way that enabled it to use its resources effectively and efficiently to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, as required by 42 C.F.R. § 483.70, as pled herein;

x.    By inadequately operating to provide services in compliance with all applicable Federal, State, and local laws, regulations, and codes, and with accepted professional standards and principles, as required by 42 C.F.R. § 483.70, as pled herein;

y.    By inadequately conducting and documenting a facility-wide assessment to determine what resources were necessary to care for the facility's residents competently during both day-to-day operations and emergencies and to review and update this assessment whenever there was any change that would require a substantial modification to any part of this assessment, and for this assessment to include the care required by the resident population considering the types of diseases and overall acuity present within that population, as required by 42 C.F.R. § 483.70(e), as pled herein;

z.    By inadequately establishing and maintaining an emergency preparedness plan that meets the requirements of 42 C.F.R. § 483.73, as pled herein;

aa.    By inadequately establishing and maintaining an infection prevention and control program designed to provide a safe, sanitary, and comfortable environment and to help prevent the development and transmission of communicable diseases and infection, as required 42 C.F.R. § 483.80, as pled herein;

bb.    By inadequately establishing a system for preventing, identifying, reporting, investigating, and controlling infections and communicable diseases for all residents, staff, volunteers, visitors, as required by 42 C.F.R. § 483.80(a)(1), as pled herein;

cc.     By inadequately establishing a system of surveillance designed to identify possible communicable diseases or infections before they can spread to other persons in the facility, as required by 42 C.F.R. § 483.80(a)(2)(i), as pled herein;

dd.     By inadequately establishing a system which specified standard and transmission-based precautions to be followed to prevent spread of infections, as required by 42 C.F.R. § 483.80(a)(2)(iii), as pled herein;

ee.     By inadequately establishing a system which specified when and how isolation should be used for a resident, including the type and duration of the isolation, as required by 42 C.F.R. § 483.80(a)(2)(iv), as pled herein;

ff.     By inadequately establishing a system which specified the circumstances under which the facility must prohibit employees with a communicable disease from direct contact with residents, if direct contract will transmit the disease, as required by 42 C.F.R. § 483.80(a)(2)(v), as pled herein;

gg.     By inadequately complying with the requirements of 42 C.F.R. § 483.80(g)(3) for informing residents and their families of Covid-10 occurrences in the facility, as pled herein;

hh.     By inadequately providing a safe, functional, sanitary, and comfortable environment to residents, staff, and the public, as required by 42 C.F.R. § 483.90, as pled herein;

ii.     By inadequately developing, implementing, and maintaining an effective training program for all new and existing staff, individuals providing services under a contractual arrangement, and volunteers, as required by 42 C.F.R. § 483.95, as pled herein; and,

jj.     By inadequately including as part of its infection prevention and control program mandatory training that includes the written standards, policies, and procedures for the program, as required by 42 C.F.R. § 483.95(e), as pled herein.

275.     As a direct and proximate result of the negligent, reckless, careless, and wanton acts and omissions of SEVC, as set forth above, SEVC's caregiving staff was unable to contain and control the spread of COVID within SEVC's walls.

276.     As a direct and proximate result of the negligent, reckless, careless, and wanton acts and omissions of SEVC, as set forth above, the Plaintiffs were exposed to and contracted COVID-19 and ultimately died from the virus.

277.     As a direct and proximate result of the negligent, reckless, careless, and wanton conduct and omissions of SEVC, as set forth above, Plaintiffs claim the following damages:

    a.     The pain, suffering, infirmity, deterioration, debilitation, confinement, loss of enjoyment of life, and anxiety of Plaintiffs related to their injuries and treatment; and,

    b.     Hospital, medical, and nursing expenses.

WHEREFORE, Plaintiffs Lawrence Mottola, Individually and as Executor of the Estate of Anthony Mottola, Deceased; William R. Murphy, III, Individually and as Administrator of the Estate of William R. Murphy, Jr., Deceased; and Lisa Krause, as Attorney-in-Fact of John Trowbridge, claim damages claim damages of the Department of Military and Veterans Affairs  as owner and operator of Southeastern Veteran Center, and demand compensatory damages from the Defendant in an amount in excess of the jurisdictional arbitration limits, together with interest, and any other relief this Honorable Court deems appropriate.

**COUNT IX:**
**<u>WRONGFUL DEATH</u>**
**(Deceased Plaintiffs vs. All Defendants)**

278.     The averments of the previous paragraphs are incorporated by reference as if fully set forth.

279.     As a proximate result of all of the Defendants' conduct as above-described, all Plaintiffs suffered injuries and died as a result of the poor care and treatment which they received by all of the Defendants as previously described. As such, Plaintiffs have also suffered the following damages:

      a.      Money for funeral and estate expenses because of the death of the Plaintiffs;

      b.      Loss of the services, assistance, guidance, counseling, companionship, and society of the Plaintiffs; and,

      c.      Financial support and all pecuniary benefits which they would have received from the Plaintiffs.

WHEREFORE, Plaintiffs Lawrence Mottola, Individually and as Executor of the Estate of Anthony Mottola, Deceased; and William R. Murphy, III, Individually and as Administrator of the Estate of William R. Murphy, Jr., Deceased claim damages of the Department of Military and Veterans Affairs as owner and operator of Southeastern Veteran Center, Rohan Blackwood, and Deborah Mullane, and demand compensatory damages from the Defendants in an amount in excess of the jurisdictional arbitration limits, together with interest, and any other relief this Honorable Court deems appropriate.

**A JURY TRIAL IS DEMANDED**

Dated: September 22, 2021                   Respectfully submitted,

                                       */s/ Robert F. Daley*
                                         ROBERT F. DALEY, ESQUIRE
                                         PA Bar ID No.: 81992
                                         D. AARON RIHN, ESQUIRE
                                         PA Bar ID No.: 87572
                                       ROBERT PEIRCE & ASSOCIATES, P.C.
                                         707 Grant Street
                                         Suite 125
                                         Pittsburgh, PA 15219

Tel: 412-281-7229
Fax: 412-281-4229
Email: bdaley@peircelaw.com
        arihn@peircelaw.com

DANIEL C. LEVIN, ESQUIRE
PA Bar ID No.: 80013
LEVIN SEDRAN & BERMAN, LLC
510 Walnut Street
Suite 500
Philadelphia, PA 19106
Tel: 215-592-1500
Fax: 215-596-4663
Email: dlevin@lfsblaw.com

*Counsel for Plaintiffs*